UNITED STATES of America,
Plaintiff-Appellee,

v.

Guadalupe M. MORADO et al.,
Defendants-Appellants.

No. 71–1309.

United States Court of Appeals,
Fifth Circuit.

Jan. 12, 1972.

Rehearing Denied Feb. 1, 1972.

James S. Bates, Edinburg, Tex., Luther E. Jones, Jr., Corpus Christi, Tex., Glenn H. Ramey, Alex W. Gabert, Rio Grande City, Tex., for defendants-appellants.

Anthony J. P. Farris, U. S. Atty., James R. Gough, Jack Shepherd, Edward B. McDonough, Jr., Raul A. Gonzalez, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

CLARK, Circuit Judge:

■ The eight appellants prosecuting this appeal were convicted by a jury in the court below of violating 18 U.S.C.A. § 241.[1] They were charged with con-

---

1. That section provides, in pertinent part:
 If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;

 \* \* \* \* \*

 They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

spiring to injure the federally protected right of those voters in Starr County, Texas, who cast ballots in the May 2, 1970 election, not to have their ballots diluted through the casting of unlawful ballots.[2] The government alleged that the appellants, along with several others not involved here, the majority of them county officials or county employees, had joined together for the purpose of causing a number of improperly delivered, improperly returned, and improperly marked absentee ballots, and applications therefor, to be processed in that election. The case—a lengthy, turbulent, and much-publicized one—began with 22 defendants, each charged under at least one count of a six-count indictment, with being part of a county-wide plot to steal an election. The trial, however, eventually proceeded under but a single count, and with the severance of one defendant, the directed judgment of acquittal as nine, and the mistrial of four others, only eight were convicted and now protest the outcome. They urge that numerous errors require their convictions to be upset. Two of the eight, Villareal and Alaniz, persuade us. We affirm, however, as to the other six.

■■ Before passing to a consideration of the various appellate arguments, and to a recitation of relevant facts, we will dispose of a single point that will help to both clarify and abbreviate the remainder of our discussion: whether or not the appellants successfully conspired is not at issue in this case, and a showing that fraud was actually perpetrated upon legitimate voters in the election is not a requisite element of the proof. The government did not need to show that the election occurred, that vote dilution was accomplished, or that a single illegitimate ballot was cast. In fact, 18 U.S.C.A. § 241 does not require that any overt act at all be shown.

Wilkins v. United States, 376 F.2d 552, 562 (5th Cir. 1967); Smith v. United States, 157 F. 721 (8th Cir. 1907), cert. denied, 208 U.S. 618, 28 S.Ct. 569, 52 L. Ed. 647 (1908). Such showings, if made, go only to aid in the establishment of that element without which the government has no case at all—that an actual agreement between two or more persons to accomplish a prohibited object existed —and to the establishment of which of these appellants, if any, were knowing parties to that agreement. It is true, of course, that the more evidence of the successful outcome of the alleged conspiracy and of the individual appellants' causal relationship to that success that can be adduced, the more likely it is that the jury will, and could properly, find that the conspiracy existed. However, contrary to the appellants' assertions, the case against them does not fail, as a matter of law, for the lack of such evidence.

## I. SINGLE OR MULTIPLE CONSPIRACY

The indictment contained six counts. The first count charged that all defendants in the case had engaged in a single broad conspiracy. The remaining counts were identical to the first as to the illegal conduct charged, but charged various combinations of less than all the defendants named in the first count. The government asserts that the purpose of charging through six counts rather than one was to allow for the possible conclusion by the jury that the evidence showed separate conspiracies existed relating to particular precincts or ballot boxes, rather than an overall conspiracy relating to the entire election. The defendants objected to the indictment on the ground it would place them more than once in jeopardy for the same offense. The district judge agreed and required the government to proceed under a

2. That this right is a federally-protected one, and an attempt to interfere with it a violation of 18 U.S.C.A. § 241, is well-settled. United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); Fields v. United States, 228 F. 2d 544, 548 (4th Cir. 1955), cert. denied 350 U.S. 982, 76 S.Ct. 468, 100 L.Ed. 850 (1955).

single count alleging a single conspiracy involving all the defendants. Predictably, but not necessarily inconsistently, the appellants allege now that the evidence did indeed show, if anything, that multiple and separate conspiracies occurred, rather than a single one, and that therefore the variance between the indictment and the proof necessitates a reversal under Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

■ Before this court, the government responds that the defendants have disabled themselves to urge that multiple conspiracies were proved because they caused or invited this error by successfully urging the court to eliminate these counts from the indictment. This argument is specious. It wholly fails to consider the responsibility placed on the government to challenge the court's action in dismissing a count of an indictment within 30 days of the decision. 18 U.S.C.A. § 3731. Having chosen to proceed to trial on the single conspiracy count alone, the government may not negate its duty to prove the charge laid beyond a reasonable doubt by asserting that the defendants invited an error which the government, with full knowledge of what its proof would show, chose to deliberately waive. The government asserts that defendants would attempt to "have their cake and eat it too." This gnome is apposite to this case, but only in its application to the initial position of the United States Attorney, who drafted a conspiracy indictment in such a way that all of these defendants could be tried together for a conspiracy that might prove to be single or might prove to be one of several. The rationale of Kotteakos forbids such an elusive prosecutorial approach.

■ Accepting arguendo, without deciding that a criminal defendant should be estopped from objecting to any error that he himself induced, we are not convinced we should apply that principle here. There is no inherent inconsistency in appellants' motion to strike counts that subjected them to double jeopardy and their subsequent motion to upset convictions that were based on proof that varied from the reconstituted indictment. A defendant has a fundamental right to be free from both errors. The appellants did not know what evidence the government would introduce; they did not know whether that evidence would tend to show a single or multiple conspiracies. What they did know at the time of their first motion was what the indictment set forth on its face. Their unchallenged success in urging that the trial should proceed on the single conspiracy count in no way forecloses them from attacking their convictions if analysis should demonstrate that the evidence proved, at most, only multiple conspiracies.

■ Having decided that as a matter of procedure, appellants are entitled to attack their convictions upon this point, we proceed to consider whether their attack has merit. We note at the outset that they must establish not only that a variance between indictment and proof occurred, but that the variance affected "the substantial rights of the parties." Kotteakos, supra, at 775, 66 S.Ct. at 1253. The art of distinguishing between evidence which tends to show a single overall conspiracy, and that which tends to show several separate conspiracies, is a frustrating and challenging one,[3] but one that courts must master if the criminal process is to resist en masse prosecutions that permit unreviewable, unmanageable transference of guilt between defendants. The Supreme Court attempted to delineate guidelines for distinguishing the single from the multiple situation in Kotteakos, and in a case decided a year later, Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). The guidelines presented there are easier to sum-

---

3. For some helpful commentary, see Developments in the Law-Criminal Conspiracy, 72 Harv.L.Rev. 920, 922–935, 991–993; Note, Federal Treatment of Multiple Conspiracies, 57 Colum.L.Rev. 387, 394–96; 65 Nw.U.L.Rev. 134.

marize than apply. The short hand test, as we said in United States v. Lloyd, 425 F.2d 711 (5th Cir. 1970), is whether or not the illegal agreement in question has "a common end or single unified purpose."

Since *Kotteakos* was a multiple conspiracy case, while *Blumenthal* involved a single conspiracy, it is helpful to take brief notice of their particular fact situations. In the former case, the government admitted that eight separate conspiracies involving some 32 defendants had been shown; a single key man, one Brown, who was part of, and directed each of the eight conspiracies, had already pleaded guilty. Brown was the only element common to the eight otherwise completely separate undertakings. No other person took part in more than one of the conspiracies, nor knew about the others, nor was acquainted with persons taking part in the others. Each conspiracy had as its purpose the fraudulent obtaining and processing of loan funds. Though each of the conspiracies had similar illegal objects, none depended upon, was aided by, or had any interest in the success of the others. *Blumenthal*, on the other hand, involved only five defendants, who were found by the court to have undertaken not two separate conspiracies, but rather a single one. The court relied upon the fact that each of the five knew, or should have known, that others were involved in an overall illegal scheme to sell whiskey. Each knew, or should have known that his activities contributed to a larger plan, and helped to achieve a single common goal. The principles announced in *Blumenthal* have come to be known as the "common objective" test, and we think they squarely control the case at bar.

Here, the evidence tended to show that a single key man—Rene Solis, the Sheriff of Starr County and a medical doctor—was involved in and directed the acquisition of absentee ballots from several different voters through various means which violated Texas election laws. The testimony of some 10 witnesses, nearly all of them elderly, most illiterate, many infirm, showed that the acquisition of the ballots usually involved unsolicited visits by Solis, accompanied by various combinations of the other appellants, during which a reluctant voter would be influenced to sign an application for absentee ballot, and be told how to mark his ballot, or would have his ballot marked for him. Subsequently, various combinations of the appellants, usually not present when the voter signed or made an "x" mark on his ballot, would sign as witnesses to the proper execution of the ballot. The ballot was normally accompanied by a certificate from Solis indicating he had examined the voter and found him to be medically unable to vote at the regularly appointed time; however, these examinations in virtually all cases never occurred. The membership overlap between the various groups involved in the several ballot acquisitions was substantial. A second appellant, Santiago Clarke, appeared in most of them. Others took part in from two to four acquisitions.[4] As in *Blumenthal*, the participants in the alleged conspiracies, which the appellants would have us call separate, knew, or should have known of the activities of the others. Their individual efforts directed toward illegal acquisition of ballots cannot be said to be distinct ends unto themselves, but rather were obviously part of a larger plan in which each acquisition and each act only made sense insofar as it depended upon others for ultimate success. Each constituted a mutually beneficial and successive step toward a single common goal—the stealing of an election. Our review of the cases since *Blumenthal* and *Kotteakos* convinces us that *Kotteakos* has been closely restricted to its particular facts, and that most courts

---

4. Two of the appellants were involved, and then only tenuously, in but one acquisition. Their individual situations will be dealt with below in the discussion on the sufficiency of the evidence.

have been willing to find that evidence is sufficient to establish a single conspiracy where clear overlapping of membership and activities, all directed toward a single common goal, is present.[5]

We finally take note that the district judge in this case, as in *Blumenthal*, carefully instructed the jury that they were to consider the guilt or innocence of each defendant separately, weighing the evidence as it pertained to him and not to others, so that the risk of guilt transference was properly minimized. There is no merit in appellants' contention upon this point.

## II. THE FIFTH AMENDMENT CLAIM

Appellant Solis complains on his own behalf, and on behalf of all other appellants, that certain letters obtained from his personal records were introduced into evidence in violation of his and their Fifth Amendment rights. Since we find his individual claim to be without merit, we need not face the question of whether the other appellants would have standing to complain of evidence that violated the constitutional rights of a co-conspirator.

The letters in question purported on their face to be requests from a number of the witnesses in this case to Solis asking that he come to their home to conduct a medical examination of them so that they might qualify to cast absentee ballots in the May 2 election. However, since the evidence at trial demonstrated rather conclusively that the letters were forgeries, they proved significant in establishing the existence of a conspiracy to fraudulently obtain a number of absentee ballots, and in demonstrating that Solis was a member of that undertaking.

The letters were originally given to the grand jury by Solis in response to a subpoena duces tecum. He initially resisted submission of the letters to this body, claiming a doctor-patient privilege. However, after the court indicated such a privilege did not lie, he voluntarily produced them. At the moment of their introduction, his counsel said: "Now the doctor's records are these. These are the records that he kept. And we are willing to submit these to the court. We have no problem." Solis now asserts that the letters were rendered inadmissible since the government did not give him *Miranda* warnings before he gave them up. We do not agree.

■ The law is settled that a potential defendant may be subpoenaed to appear before a grand jury and be subsequently indicted without violating the self-incrimination proscription, if he testifies voluntarily. Blackwell v. United States, 405 F.2d 625 (5th Cir. 1969); *see* Rogers v. United States, 340 U.S. 367, 371, 71 S.Ct. 438, 95 L.Ed. 344 (1951); United States v. Monia, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943). Though we are well-satisfied that Solis did indeed produce the letters voluntarily, and did so knowingly and intelligently upon advice of counsel then present, we are aware that the *Miranda* warnings were designed to protect a man from making admissions that, though they appear to be voluntary, would not have been made but for the coercive pressure of "custodial interrogation." Thus the question becomes whether Solis, at the moment of his appearance before the grand jury, was being subjected to questioning by law enforcement officers after having been "taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

■ Though this circuit has recently pretermitted the question of the scope of *Miranda* in the context of grand jury investigations, Mattox v. Carson, 424 F.2d 202 (5th Cir. 1970),

---

5. *See, e. g.*, United States v. Lloyd, 425 F.2d 711 (5th Cir. 1970) ; United States v. Nasse, 432 F.2d 1293 (7th Cir. 1970) ;

United States v. Borelli, 336 F.2d 376 (2d Cir. 1964).

cert. den., 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 51 (1971), the general rule is that a grand jury witness is not entitled to warnings of his right to counsel, and his right to remain silent. Robinson v. United States, 401 F.2d 248 (9th Cir. 1968); United States v. DiMichele, 375 F.2d 959 (3rd Cir. 1967); United States v. Winter, 348 F.2d 204 (2nd Cir. 1965); United States v. Parker, 244 F.2d 943 (7th Cir. 1957); United States v. Scully, 225 F.2d 113, 116 (2nd Cir. 1955). The Sixth Circuit, however, has recognized that when a man ceases to be merely a witness in a general investigation, but has been placed "virtually in the position of a defendant," then he must be afforded the fully panoply of rights due a defendant in custody. United States v. Luxenberg, 374 F.2d 241 (6th Cir. 1967); Stanley v. United States, 245 F.2d 427 (6th Cir. 1957). Without intimating whether this circuit will agree with this "virtual defendant" perspective, we note that its emphasis is upon the same factor we have considered to be of prime importance in determining whether or not a man is "in custody," as that term is used in *Miranda*: has the "focus" of the investigation centered upon him? United States v. Phelps, 443 F.2d 246 (5th Cir. 1971); United States v. Akin, 435 F.2d 1011 (5th Cir. 1970); United States v. Montos, 421 F.2d 215 (5th Cir. 1970); Bendelow v. United States, 418 F.2d 42 (5th Cir. 1969); Windsor v. United States, 389 F.2d 530 (5th Cir. 1968). If the investigation in the case at bar had passed beyond the stage of being a general inquiry into an unsolved crime or a suspected conspiracy, and had focused upon Solis as a defendant whom the government planned to indict and against whom it was gathering incriminating evidence, we would face the necessity of embracing or rejecting this rule. But Solis has not argued that such was the tenor of the grand jury proceeding; nor does our review of the record reveal it to have been so. Hence, we conclude that in the absence of a "focus", and in the presence of an attorney, Solis was simply not under a compulsion so similar to that of being subjected to "custodial interrogation" that an extension of *Miranda* to cover one circumstanced as he was here would be warranted.

 Solis's lawyer's comment bears the obvious hallmark of a calculated trial tactic of a counsel who has determined to disarm the investigation by feigning innocence. Solis obviously handed the letters over to the grand jury in reliance upon his lawyer's chosen tactic rather than because of any feeling of compulsion generated by the force of the subpoena or by any feeling that the investigation was then focused on him. He may not rue back this bargain he voluntarily made because the end now demonstrates that the tactical course his counsel chose for him was wrong. Some element of official compulsion remains the *sine qua non* of a successful invocation of the right to *Miranda's* protection. United States v. Prudden, 424 F. 2d 1021 (5th Cir. 1970).

### III. THE INDICTMENT

 Appellants contend that the indictment in this case actually charges no crime at all in that the election concerning which they assertedly conspired does not exist. The portion of the indictment to which they refer states that: "On the 2nd day of May, 1970, . . . a primary election was held . . . for the purpose of electing . . . Democratic and Republican candidates for United States Senator and Representative. . . ." The argument is that there could not be *a* primary election for the purpose of electing Democratic *and* Republican candidates since a primary is by definition in Texas law,[6] an election held by the members of a single party *to choose its candidates for public office.* Once this attack is cast in its proper mold of a was-there-a-prejudicial - variance - between - indictment - and-proof-issue, it can be clearly seen to be without merit. For appellants to

---

6. 9 Vern.Ann.Tex.Stat., Election Code, Art. 13.01.

convince us now that prejudicial error has occurred owing to the use of the word "primary" rather than "primaries", they would have to demonstrate that the government's evidence so unfairly surprised them that they were hampered in effective preparation of their defenses, or that they will be unable to plead the prosecution under this indictment as an effective bar to any subsequent actions against them for the same offense. United States v. Bullock, 451 F.2d 884 (5th Cir. 1971). They have not done so.

The Texas Election Law designates the first Saturday in May as "general primary election day," and, since a majority vote is required to nominate, it provides that should a runoff be necessary, it will occur the first Saturday in June in the "second primary election." [7] Thus, within the election laws themselves, the word "primary" is used to indicate both the entire election process to be held on a day set by law, and the election held within the membership of a single party. Whether as a matter of conceptual approach the appellants would prefer to consider the election of May 2 two primary elections—one Democratic and one Republican—or a single primary election in which candidates for both parties were independently chosen, they knew precisely the May 2, 1970 election activity to which the government's evidence would refer. The defendants were fairly apprised of the charges against them and could adequately prepare to meet them. The calendar-precise description of the election involved likewise provides absolution from the hazard of subsequent charges. Further semantic explorations might be possible but, lacking the reality of prejudice, they can only lead in circles.

## IV. SUFFICIENCY OF THE EVIDENCE

Appellants finally contend that the evidence was insufficient to establish their guilt. Being aware that in a situation where many defendants may be brought to trial at the same time, each "in varying degrees of attachment to the confederation, [that] the possibilities for miscarriage of justice to particular individuals become greater and greater," (*Kotteakos, supra,* 328 U.S. at 776, 66 S. Ct. at 1253), we have reviewed the record from the aspect of each defendant individually, as well as for its overall impact.

Appellate review of conspiracy convictions has generally been a two-step process: first, to determine whether the evidence is sufficient to show that a conspiracy existed; second, to consider which, if any, of the appellants were shown to be members thereof.

The first step requires the showing of an agreement. It is not enough in this case that votes were stolen, or that state election laws were violated. Some persons must be shown to have been actual *confederates* in a plan to accomplish the illegal dilution of votes. Secrecy being the essence of this concert, it was predictable that the prosecution was not able to establish it through direct evidence. However, this circuit is committed to the principle that proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence —ordinarily the acts and conduct of the alleged conspirators themselves. United States v. Warner, 441 F.2d 821 (5th Cir. 1971); Rodriguez v. United States, 373 F.2d 17 (5th Cir. 1967). Not weighing conflicting evidence, nor considering the credibility of witnesses, but viewing the evidence and the reasonable inference to be drawn therefrom, in a light most favorable to the government,[8] we are convinced that the jury could have reasonably found the existence of a conspiracy. They were shown numerous occasions when different combinations of the same people, each combination employing similar tactics, and each directed by a single person, with consistent and meticulous

7. *Id.*, Art. 13.03.

8. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941); United States v. Jacobs, 451 F.2d 530 (5th Cir. 1971).

success, obtained illegitimate absentee ballots. *See* Fields v. United States, 228 F.2d 544 (4th Cir. 1955); Ledford v. United States, 155 F.2d 574 (6th Cir. 1946).

Passing to the second step of our consideration of the evidence— which of the defendants were established to have been members of the conspiracy—we are more troubled. Certainly great difficulties of proof face a prosecutor who must establish membership in a conspiracy. However, it is not a difficulty without compensation, for the government need only show "slight evidence" that a particular person was a member of a conspiracy once the conspiracy itself is established. *Warner, supra*, at 830; Lopez v. United States, 414 F.2d 909 (5th Cir. 1969). Some commentators suggest that this is an overcompensation.[9] Our adherence to the "slight evidence" rule should make us nonetheless insistent that guilt remain "individual and personal"[10] and that the government show beyond a reasonable doubt that each and every alleged member of the conspiracy had the deliberate, knowing, specific intent to join the conspiracy. Mere association with conspirators, knowledge of the illegal activity, or violation of election law will not do. Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969); Causey v. United States, 352 F.2d 203, 207 (5th Cir. 1965).

We find that the evidence as to six of the appellants, Barrera, Pilon, Morado, Gayton, Solis, and Clarke, is sufficient to sustain their individual connections with the conspiracy.[11] As to at least one of these, Gayton, the evidence is indeed "slight," but we think enough to support his conviction.[12] As to two others, Villareal and Alaniz, we cannot say that. Villareal was connected with the conspiracy solely on the basis of his alleged role in obtaining the vote of one Garza, a blind woman. Garza testified that "they" came to her house to get her vote, but that she didn't know who "they" were. She further testified that *either* Villareal *or* Solis guided her hand in marking her ballot. Alaniz was connected with the conspiracy solely on the basis of her alleged role in obtaining the vote of one Vela. Vela was the most equivocal of any witness the government presented. During the course of her testimony, she was unsure and inconsistent as to whether she had voted absentee or at the regularly appointed time in the May 2 election, and as to whether Alaniz had picked up her ballot. All that remains besides this testimony that might implicate Alaniz was that Alaniz' purported signature appears as witness to voter Vela's "x" mark. That cannot be said to prove beyond a reasonable doubt to any reasonable juror that Alaniz violated 18 U.S.C.A. § 241. The same is true for Villareal. The evidence as to these two appellants is less than slight.

We do not blithely reverse these two convictions.[13] The government went to great lengths in this case to attempt to undo the intolerable, stulti-

---

9. 72 Harv.L.Rev., *supra*, n. 3 at 984.

10. *Kotteakos, supra*, 328 U.S. at 772, 66 S.Ct. 1239.

11. Solis and Clarke, as earlier mentioned, played substantial parts in the acquisition of nearly all the votes testified to at trial. Clarke's primary contribution, though he had a personal hand in the pressured voting of Sepulveda and one Fuentes, was improperly serving as notary and witness to voting for which he was not present. Morado took part in unduly influencing one voter's marking of her ballot, and also improperly witnessed a signature for which he was not present. Pilon told at least two voters how to mark their ballots. Barrera told one voter how to vote, and improperly executed the carrier envelope for another.

12. Gayton went along with Solis, uninvited, to the home of Rita Lopez. He signed for her as notary, witnessed her "x" mark, and carried away a ballot she testified she had not marked.

13. The appellants Villareal and Alaniz, along with the other appellants, moved for a new trial in the court below. Therefore, the government is entitled to retry them if it chooses to do so. United States v. Musquiz, 445 F.2d 963 (5th Cir. 1971).

fying debasement of our democratic processes wrought at the hands of those who steal votes to perpetuate themselves in office. The government's case was as diligently prepared and ably presented as possible, given the limitations of those witnesses through whom it had to be developed. The jury, the sole judges of credibility, thought these two, as well as the other six, guilty of the conspiracy. They may well be. But the government did not prove it. Although the law of conspiracy has relaxed many a rule of evidence, it cannot dispense with proof that does not rise to the minimum level of showing even slight evidence of guilty participation.

Affirmed in part, and reversed and remanded in part.