**UNITED STATES of America**

v.

**Paul Gonzales RANGEL.**

**UNITED STATES of America**

v.

**Roy MANDUJANO.**

**Crim. Nos. SA 73 CR 164, SA 73 CR 163.**

United States District Court,
W. D. Texas,
San Antonio Division.

Oct. 12, 1973.

William S. Sessions, U. S. Atty., John M. Pinckney, III, Asst. U. S. Atty., San Antonio, Tex., for plaintiff.

Stewart Alexander, San Antonio, Tex., for defendant Paul Gonzales Rangel.

Ruben Sandoval, San Antonio, Tex., for defendant Roy Mandujano.

SPEARS, Chief Judge.

This matter involves the defendants' separate motions to suppress their testi-

mony before the special grand jury which was convened on May 2, 1973. The two cases before the Court, though not consolidated, and not involving the same transaction, embody virtually identical sets of circumstances. Each defendant is charged in a two count indictment with an attempt to distribute heroin in the first count, and with perjury before the grand jury in the second count. The indictment for perjury in each case (count two) is based upon each defendant's denial before the grand jury of any attempt to sell heroin, or any solicitation to do so, while count one alleges that each defendant did in fact make just such an attempt to sell to drug enforcement officials. Both alleged attempts took place prior to the defendants' grand jury appearances.

As to defendant Rangel, the indictment alleges that he attempted to distribute three ounces of heroin on or about the 8th day of December, 1972. The record reflects that a federal narcotics agent in December of 1972, attempted to purchase three ounces of heroin from him, and discussions about money for the supposed drugs took place, though no money ever changed hands.

With respect to the defendant Mandujano, the indictment alleges that he attempted to distribute one ounce of heroin on or about the 29th of March, 1973. A different federal narcotics agent testified that in March of 1973, he made contact with Mandujano, and offered him money for the purchase of heroin, giving him $650 for the alleged attempted purchase.

■ Defendants maintain that the interrogation by the special attorney for the Drug Enforcement Administration before the grand jury intentionally tracked the exact facts of the actual contacts between federal narcotics agents and the defendants, and that the questions were asked as a continuing part of an investigation of the narcotics activities of the defendants.[1] The agents in-

---

1. When the special attorney for the Drug Enforcement Administration questioned Rangel before the special grand jury, the following exchange took place:

Q: Have you ever offered to sell heroin, get heroin for someone?
A: No, sir.
Q: Let me ask you specifically have you at any time within the last four months, five months, since December 1st last year, the month Christmas was in, have you since then at any time sold any heroin to anyone—
A: No, sir, I haven't.
Q: For money? Have you offered to sell heroin to anyone during that period?
A: (Nod negative).
Q: Have you talked with anyone since December 1, 1972, about getting them some heroin—
A: No, sir.
Q: Or selling some heroin?
A: (Nod negative).
Q: I want to make this clear to you. I think—in fact I know I told you at the outset that we will ask you certain questions and if you make a statement, you are under oath and Mr. Tarbutton, the foreman of the grand jury, who asked you to raise your right hand tell the truth, the whole truth and nothing but the truth—We have asked you questions and if you have lied to us, in other words if you have made a false answer, false statement in response to some of these questions I have asked you, particularly those I have just asked you about heroin, having heroin, selling heroin or trying to get heroin to sell for somebody, if you made a false statement and we prove it is false, you have committed a felony, a federal felony. Do you understand that?
A: Yes, sir, I do.
Q: With that in mind do you still make the same answer to the questions I have just asked you about the sale?
A: Yes, sir . . .
A member of the grand jury then asked:
Q: Let's go back just a little bit there, Mr. Rangel, back in December, four months ago, five months ago, December of 1972—
A: Yes, sir.
Q: Before Christmas a couple of weeks. Did you at any time offer to obtain some heroin for someone that came to see you?
A: No, sir.
Q: Your nickname is Payo?
A: Yes, sir.
Q: Are you sure about that?
A: Yes, sir.

volved, and the government attorney who appeared before the grand jury, testified that they had discussed the circumstances of the attempted buys in preparation for the appearance of Rangel and Mandujano before the grand jury. Given the nature of the investigation and the questions asked before the grand jury, the defendants maintain, and this Court agrees, that full *Miranda* warnings should have been given to the two individuals who were in a position of "putative" or "virtual" defendants.

The government maintains that neither case was considered for presentation to the grand jury prior to the testimony of the defendants before that body, and that both files had been closed following the contact between the defendants and the law enforcement officers; nevertheless, the facts of the case belie the government's protestations of innocent intent with respect to the possibility of future prosecutions. The special attorney who had conducted the questioning testified that he was well aware of the previous contacts with the defendants in attempts to buy from them, as well as the exact circumstances involved in each attempted buy. The transcript of the grand jury proceedings reveals deliberate and careful attention to questions which specifically delved into the facts concerning these contacts between the defendants and government agents. The special attorney was aware that no case had been made, and though this Court does not presume any improper motives on the part of the government agents or the special attorney, it strains credulity to suggest that the special attorney did not have one eye on a possible prosecution of the defendants.[2] The government had in fact already attempted to make a case against each defendant. Note too that each defendant, immediately after denying any contact about an attempted sale, was asked in the very next question about the validity of that answer, and defendant Rangel was promptly cautioned again about the penalty for perjury. Considering the totality of the circumstances in this case, the questioning of the defendants before the grand jury smacks of entrapment. Moreover, given the fact that the investigatory files involving the attempts to buy from

The defendant Mandujano was asked the following questions, among others:

Q: Have you ever talked with anybody about selling it? Has anybody tried to buy heroin from you? Have you tried to get heroin for them in order to sell to them?
A: No, sir.
Q: Are you sure of that?
A: Yes, sir.
Q: In other words, no one has ever come up to you and wanted to buy heroin?
A: No, sir.
Q: And you have never told anybody that you would try to get heroin to sell to them?
A: No, sir.
Q: Now, you can say here today that you have not discussed the sale of heroin with anybody in the last year.
A: I don't understand you, sir.
Q: Have you talked to anybody about selling heroin to them during the last year?
A: No, sir.
Q: You are sure about that?
A: I just, you know, I discuss it, you know, when we buy it, you know, to fix it just, you know.

Q: Has anyone ever asked you if they could buy an ounce of heroin or more from you?
A: No, sir.
Q: Let me ask you once again, Mr. Mandujano, have you ever talked to anybody about selling them heroin in the last year?
A: No, sir.
Q: No one has ever given you any money—
A: No.
Q: —to go buy them heroin?
A: No, sir . . . .
Q: In other words, if you had $650 right now—
A: Yes, sir.
Q: —do you think you would be able to purchase an ounce of heroin?

2. It seems more than coincidence that when the special attorney questioned defendant Mandujano about buying one ounce of heroin, he offhandedly mentioned the exact amount of money offered Mandujano by the special agent when that agent attempted to buy from Mandujano.

both defendants had been closed, the questions posed presented a high likelihood that the answers provided by the defendants would furnish material for further action on the part of the government. If the defendants had admitted that they had offered to buy heroin for the undercover agent who approached them, the government could possibly have used such an admission in its case-in-chief in connection with the attempted sale. See United States v. Leighton, 265 F.Supp. 27 (S.D.N.Y.1967), cert. denied, 390 U.S. 1025, 88 S.Ct. 1412, 20 L.Ed.2d 282 (1968); United States v. Montos, 421 F.2d 215 (5th Cir.), cert. denied, 397 U. S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). The denial by defendants that they had conversations about procuring heroin for the officers left them open to the consequent indictments for perjury. Actually, therefore, their only safe harbor would have been to remain silent, and this option was, in effect, denied to them.

The fact that defendants may have subjected themselves to serious risk of prosecution for perjury, or for the substantive attempt to sell heroin, would not necessarily have barred further use of their testimony. Certainly, if they had received full *Miranda* warnings during the initial phase of their appearance before the grand jury, but had continued to willingly testify, then their testimony would very likely have constituted a voluntary waiver of the right to remain silent. The Fifth Circuit has recently restated the well recognized rule that "a potential defendant may be subpoenaed to appear before a grand jury and be subsequently indicted without violating the self-incrimination proscription, if he testifies voluntarily." United States v. Morado, 454 F.2d 167, 172 (5th Cir.), cert. denied, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972).

This Court finds that neither defendant made a complete, knowing, and intelligent waiver of the right to remain silent, nor was either defendant properly apprised of that right, or of his right to appointed counsel outside the grand jury room. As to defendant Rangel, the statement of the right to remain silent was so garbled as to be highly suspect, especially in the context of the following complete excerpt from the transcript:

"Now anytime I ask you a question and you feel the answer would tend to incriminate you, you have a right to refuse to answer that question, but you can't refuse to answer a question if it is not—if the answer would not tend to incriminate you. In other words, you would be in contempt of court. Do you understand what I mean by incriminate you?"

Besides the convolution of the double negative in the foregoing language, that warning, as administered to defendant Rangel, contains an implicit threat which all but negates the warning of the right to remain silent. The special attorney examining the defendant did not suggest to Rangel that he *could* be held in contempt, if he wrongly refused to answer. Instead he told the defendant that he *would* be held in contempt, if he made the wrong guess as to the incriminating nature of an answer. The explanation by the special attorney thus carried a strong implication that any doubt as to the incriminating nature of a response should be resolved by the defendant in favor of answering, instead of in favor of silence. Judgments about the actual incriminating nature of a statement present great difficulties even for attorneys well versed in the law, so, as a general rule, they advise clients to opt for silence whenever any doubt exists. It is certainly unrealistic, as well as unfair, to require a putative defendant, who is not learned in the law, to choose between "incriminating" and "non-incriminating" answers, especially in the somewhat imposing environment of the grand jury room, unless he has been fully, completely, and unambiguously advised of his right to remain silent, and voluntarily waives that right.

This Court has equal difficulties with the warning given defendant Manduja-no:

Q: "Now you are required to answer all the questions that I ask you except for the ones that you feel would tend to incriminate you. Do you understand that?

A: Do I answer all the questions you ask?

Q: You have to answer all the questions except for those you think will incriminate you in the commission of a crime. Is that clear?

A: Yes, sir.

Q: You don't have to answer questions which would incriminate you. All other questions you have to answer openly and truthfully. And, of course, if you do not answer those truthfully, in other words if you lie about certain questions, you could possibly be charged with perjury."

Here the questioning attorney stressed not the right to remain silent, but the requirement that the defendant answer all of the questions put to him, with limited exceptions. He did not stress the alternative of the defendant remaining silent in the face of a potentially damaging question, but instead stressed the penalty for perjury. As the Supreme Court said in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), " 'Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights."

The government has argued strenuously that witnesses before the grand jury are entitled to no *Miranda* warnings whatsoever, United States v. DiMichele, 375 F.2d 959 (3d Cir.), cert. denied, 389 U.S. 838, 88 S.Ct. 54, 19 L.Ed.2d 100 (1967); United States v. Orta, 253 F.2d 312 (5th Cir.), cert. denied, 357 U.S. 905, 78 S.Ct. 1149, 2 L.Ed.2d 1156 (1958); United States v. Scully, 225 F. 2d 113, 116 (2d Cir.), cert. denied, 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955); United States v. Wolfson, 294 F.Supp. 267 (D.Del.1968), but the defendants in the instant case were not ordinary "witnesses" when they entered the grand jury room.

It is significant that in many cases upholding indictments brought subsequent to appearances before grand juries, the defendants were clearly warned of their right to remain silent and their right to counsel. United States v. Di-Michele, *supra*, held only that *Miranda* warnings were not required in the grand jury room itself, especially in light of the fact that the defendant had already been "fully advised of his right to remain silent and to counsel."[3] Most cases where grand jury testimony has been challenged as violative of witnesses' Fifth and Sixth Amendment rights have involved clear and complete warnings on the part of the government prosecutor. In United States v. Corallo, 413 F.2d 1306, 1329 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L. Ed.2d 422 (1969), the warning given stressed the right to refuse to "answer any questions the grand jury may ask you today the answers to which you feel . . . tend to incriminate you personally." This is unlike the present case in which the warning stressed instead the compulsion to testify. In addition, the witness in *Corallo* was cautioned that if the questions were answered, they might be used against him in a court of law. In all fairness, this Court believes that such a warning would have been not only instructive, but highly appropriate in the circumstances of this case. In United States v. Potash, 332 F.Supp. 730 (S.D.N.Y.1971), the witness was warned that he had an absolute right under the Fifth Amendment to refuse to answer incriminating questions, and "if you cannot afford an attorney, you have the right to have an attorney appointed free of charge, to remain outside the Grand Jury room, and you may consult

---

3. 375 F.2d at 960.

with him prior to answering any of my questions."[4]

The Sixth Circuit has clearly held that when a witness before a grand jury is "virtually in the position of a defendant," then he must be advised of his right to refuse to answer incriminating questions, and that anything he says may be used against him. United States v. Luxenberg, 374 F.2d 241 (6th Cir. 1967). In United States v. Fruchtman, 282 F.Supp. 534 (N.D.Ohio 1968), cert. denied, 400 U.S. 849, 91 S.Ct. 39, 27 L. Ed.2d 86 (1970), the Court explored the meaning of the "virtual defendant" language, and in circumstances very similar to the instant case, found the witness to be a virtual defendant. In *Fruchtman* the government attorney submitted an affidavit denying that the witness was a potential defendant at the time of questioning. Yet the Court noted that the same attorney had read investigative reports detailing the circumstances about which the witness was questioned before the grand jury. These facts are very similar to those in the instant case, where the special government attorney read the narcotics agents' reports prior to the grand jury session.[5]

Although the Fifth Circuit has not expressly dealt with the full scope of *Miranda* in the context of grand jury investigations, Mattox v. Carson, 424 F.2d 202 (5th Cir.), cert. denied, 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 51 (1970), it did examine the problem to some extent in United States v. Morado, 454 F. 2d 167 (5th Cir.), cert. denied, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972), where, without indicating

whether it would agree with the "virtual defendant" concept, noted the Sixth Circuit's emphasis upon "the same factor we have considered to be of prime importance in determining whether or not a man is 'in custody,' as that term is used in *Miranda*: has the 'focus' of the investigation centered upon him?"[6] The Court then indicated its sympathy with the idea that if the investigation had passed beyond the stage of a general inquiry into an unsolved crime or a suspected conspiracy, and had focused upon the defendant as someone whom the government planned to indict, and against whom it was gathering incriminating evidence, then the defendant would be in the position of the "virtual defendant". This Court finds the language of the Fifth Circuit in Morado especially applicable in the instant case, where there was no basis (other than hope) for the perjury count of the indictment until after the grand jury appearance. The fact that the questioning attorney immediately pounced upon each defendant's denial that he had been contacted about sales of heroin, indicated a clear and direct focus upon Rangel and Mandujano as future defendants.

Under the circumstances of this case, this Court finds that Rangel and Mandujano were putative defendants as outlined in the "virtual defendant" rule of the Sixth Circuit, and holds that both witnesses had a right to be warned of their right to remain silent in regard to any question which might tend to incriminate them; that any testimony given might be used against them in a court of law; and that if either of them

4. 332 F.Supp. at 733 n. 3 (1971). See also United States v. Irwin, 354 F.2d 192, 199 (2d Cir. 1965), cert. denied, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966) ; United States v. DiGiovanni, 397 F.2d 409 (7th Cir.), cert. denied, 393 U.S. 924, 89 S.Ct. 256, 21 L.Ed.2d 260 (1968).

5. "Although the Government contends that it did not at the outset intend to obtain an indictment against defendant as a result of his testimony, it does not appear that the examination would have been conducted any differently if it had . . . . [A] man's rights

do not depend on the subjective intent of the prosecutor nor upon the prosecutor's knowledge as to what acts, if committed, might constitute an offense under the law." 282 F. Supp. at 536 (1968).

6. Many courts have found that grand jury investigations of witnesses who later became defendants were not custodial interrogations. See e. g., United States v. Morado, 454 F.2d 167, 173 (5th Cir.), cert. denied, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972) ; United States v. McGinnis, 344 F.Supp. 89 ¦(S.D.Tex.1972).

wanted an appointed attorney he had a right to have one available to him for consultation outside the grand jury room.[7]

■ This Court agrees with the argument that as a matter of policy a *de jure* or *de facto* defendant should never be called before a grand jury, unless, of course, he volunteers to testify.[8] But if a defendant or putative defendant is called to appear before the grand jury, the very least that should be accorded him is a full and complete recitation of his constitutional rights, in order to make certain that if he does testify, his testimony will have been given knowingly, voluntarily, and intelligently.

■ This Court does not suggest that every *witness* before a grand jury has a *right* to appointed counsel present outside the grand jury room,[9] but when an indigent witness requests that counsel be appointed to assist him, it may be a wise policy to comply with such request.[10] However, in the case of a virtual or putative defendant, the exercise of

---

7. Actually, Mandujano told the special attorney that he didn't have the money to get a lawyer. The exchange during the grand jury proceedings between Mr. Mandujano and the questioning special attorney included the following:

Q: Have you discussed your presence here with anybody?
A: My wife.
Q: Have you contacted a lawyer in this matter?
A: No sir, I haven't.
Q: I take that to mean then that you do not wish the services of a lawyer here today?
A: I don't have one. I don't have the money to get one.
Q: Well, if you would like to have a lawyer, he cannot be inside this room. He can only be outside. You would be free to consult with him if you so chose. Now, if during the course of this investigation, the questions that we ask you, if you feel like you would like to have a lawyer outside to talk to, let me know.
A: Yes, sir.
Q: Is that clear?
A: (Nod affirmative).

Mr. Rangel was asked the following questions:

Q: You are not under arrest.
A: I know, sir.
Q: You know that. As far as I know there are no warrants out for your arrest. You have a right to an attorney if you want one. Do you have an attorney?
A: He didn't tell me anything. They just gave me the subpoena.
Q: No, I say did you talk to an attorney after you got the paper, the subpoena?
A: No, sir . . . I didn't.
Q: You have the right to an attorney if you want one. He can't be in here with you. The rules wouldn't permit it, but he could be outside and you could talk to him anytime you want to.

At no time was either defendant told that an attorney would be furnished him free of charge if he was financially unable to employ one. This Court finds the words of the Fifth Circuit in Irving v. Breazeale, 400 F. 2d 231, 235 (1968) especially telling in this regard: "An accused cannot be found to have waived a right if he was not aware that he had it. Thus it is not sufficient merely to ask an indigent defendant whether he wants a lawyer. If he is unaware that counsel will be appointed whether he can afford to pay or not, he will not likely say that he wants a lawyer even if he thinks he needs one."

It should be noted that a Criminal Justice Act Guideline approved by the Judicial Conference of the United States in September, 1973 provides:

"When a judge appoints counsel for a witness before a grand jury under the terms of the Criminal Justice Act in cases in which the witness faces loss of liberty, such appointment shall be deemed to be an appointment under the general terms of the Act rather than under the terms of subsection (g) and that ordinarily such appointment should be considered to be an appointment in a misdemeanor case."

8. "Indeed, one would suppose that, as a matter of ethics or fair play or policy, a prosecutor would in all cases refrain from calling as a witness before a Grand Jury any person who is *de jure* or *de facto* an accused. The absence of appeals to this court involving the problem under discussion would seem to indicate that some such rule or practice is observed in the prosecutors' offices in this circuit." United States v. Scully, 225 F.2d 113, 116 (2d Cir.), cert. denied, 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955). See also United States v. Messitte, 324 F.Supp. 334, 338 (S.D.N.Y.1971).

9. See United States v. Daniels, 461 F.2d 1076 (5th Cir. 1972); United States v. De Sapio, 299 F.Supp. 436, 440 (S.D.N.Y.1969).

10. See generally Right to Counsel Before Grand Jury, 41 F.R.D. 189 (1966).

proper judgment as to the incriminating effect of any answers before the grand jury becomes doubly important. In such a case the right to counsel would be an empty one indeed if those capable of retaining a private attorney could consult with them outside the grand jury room, but those unable to pay, but equally subject to the penalties of the criminal law, could not.

■ Both incriminating testimony and testimony later proved to be perjurous have been upheld as admissible when a defendant has been fully advised of his constitutional rights. United States v. Potash, 332 F.Supp. 730, 732 (S.D.N.Y.1971), United States v. Di-Giovanni, 397 F.2d 409, 412 (7th Cir.), cert. denied, 393 U.S. 924, 89 S.Ct. 256, 21 L.Ed.2d 260 (1968). There is no appreciable difference between the suppression of incriminating substantive evidence given before a grand jury in the absence of warnings, and the suppression of perjurous testimony given under the same circumstances. The Fifth Circuit, eight years before *Miranda*, stated that "under no circumstances, however, could [a witness] commit perjury and successfully claim that the Constitution afforded him protection from prosecution for that crime." United States v. Orta, 253 F.2d 312, 314 (5th Cir.), cert. denied, 357 U.S. 905, 78 S.Ct. 1149, 2 L.Ed.2d 1156 (1958),[11] and United States v. Daniels, 461 F.2d 1076, 1077 (5th Cir. 1972). But in view of the subsequent holding in *Miranda*, there is an essential difference now between a *prosecution* for perjury, when there have been no *Miranda* warnings, and the

suppression of testimony under the exclusionary rule, when such warnings have not been given. This crucial difference between the dismissal of an indictment and the suppression of testimony, which otherwise might be utilized in a prosecution, has been noted by the courts in different contexts many times.[12] In short, the proper remedy for testimony acquired in the absence of *Miranda* warnings is the suppression of the testimony and not the dismissal of the indictment.

One obvious purpose of *Miranda* was to avoid putting a defendant to the Hobson's choice of either incriminating himself or lying. In the case of the putative defendant who has not been properly warned of his rights, the only choice available to him apparently lies between incriminating himself or giving false testimony. *Miranda* would be vitiated if the government, by failing to give the warnings, could force the witness to guess as to which type of testimony is properly protected under the Fifth Amendment. In that event, an incorrect guess by such a witness would clearly constitute a situation in which he would have been "compelled to be a witness against himself."

While this Court agrees that the issuance of a subpoena to appear before a grand jury is not inherently coercive, United States v. Cleary, 265 F.2d 459 (2d Cir. 1959), it is quite obvious here that the defendants may very well have perceived themselves under an apparent compulsion to testify, a situation which falls within the ambit of custodial interrogation by virtue of the investigation

---

11. In *Orta* the Court appeared to make a distinction between the consequences of a witness (unwarned of his right to remain silent) choosing to testify falsely, rather than in a truthful though incriminating manner. The Court held that the Fifth Amendment would protect the witness from the truthful, incriminating statement, but if the witness testified perjurously, then the Fifth Amendment would offer no protection: "As said in Glickstein v. United States, 1911, 222 U.S. 139, 142, 32 S.Ct. 71, 56 L.Ed. 128, . . .

'* * * the immunity afforded by the constitutional guaranty relates to the past, and does not endow the person who testifies with a license to commit perjury.' "

12. *See, e.g.*, United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966) ; Mattox v. Carson, 424 F.2d 202 (5th Cir.), cert. denied, 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 51 (1970) ; United States v. Wolfson, 294 F.Supp. 267, 275 (D.Del. 1968).

having focused on them,[13] thus depriving them of "freedom of action in [a] significant way."[14]

 As was pointed out in the case of In Re Kelly, 350 F.Supp. 1198 (E.D. Ark.1972), courts cannot legitimately and fairly distinguish the appearance of some witnesses before the grand jury from the appearance of others based merely upon the expressed subjective intent of government attorneys. Long after presentment and a grand jury vote upon an indictment, it becomes extremely difficult for even the most attentive attorney to recall exactly that moment when his view toward an individual changed from the impartial questioning of a witness to the sharp inquisitorial search directed toward a prospective defendant. See also United States v. Kreps, 349 F.Supp. 1049 (W.D.Wis. 1972).

If decisions as to the rights to be afforded individuals turned strictly upon the exact time of indictment, or presentment of a case to a grand jury, or commencement of an investigatory file, simple delay of time of indictment would subvert *Miranda* to the point of meaninglessness. When it is clear that an individual is being questioned with an eye to possible prosecution, and when an investigation has narrowed to close inquiry concerning that individual's behavior, as distinguished from his knowledge of activities performed by others, then that individual should be fully and carefully advised of his rights.

As a practical matter, this Court does not see that any undue burden would be placed upon the functions of the grand jury if *every* witness were fully advised as to the *Miranda* rights. Many witnesses enter the grand jury room already knowing the importance and meaning of the right to remain silent. For them, a *Miranda* warning does not impede the investigatory process in the least. And those who enter the grand jury room without such knowledge of their rights have no less a right to remain silent with respect to matters which might tend to incriminate them, or to consult counsel, than their more informed counterparts; and pursuant to the concept of "equal justice under law," the government has no valid right to expect, as a matter of course, to be allowed to take advantage of the status of the less informed as an aid in its investigation and prosecution.

Considering all of the facts surrounding the appearances of Roy Mandujano and Paul Gonzales Rangel before the May, 1972 special grand jury, this Court finds and ORDERS that their testimony before said grand jury be and the same is hereby suppressed.

---

13. Escobedo v. Illinois, 378 U.S. 478, 485, 492, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

14. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).