Judge Rosemary Ledet
In this criminal appeal, three defendants-Demond "Lil D" Sandifer ("Sandifer"), Sam "Lil" Newman ("Newman"), and Tyron "T-Man" Harden ("Harden") (collectively, the "Defendants")-appeal their respective convictions and sentences for murder, attempted murder, conspiracy to commit racketeering, conspiracy to commit illegal use of weapons, first degree robbery, and illegal carrying of weapons. With respect to the convictions, we affirm; with respect to the sentences, we affirm in part, correct in part, vacate in part, and remand.
STATEMENT OF THE CASE
Around 2008, a criminal street gang called the "110'ers" formed in the New Orleans Lower Garden District.[1] The 110'ers consisted mostly of males in their late teens and early twenties, and its territory centered around the River Garden Apartments. The 110'ers was comprised of three sub-gangs: the St. Thomas Youngins ("STY"), the St. Mary Mafia ("SMM"), and the Skull Squad Mafia ("SSM"). In 2011, SSM began associating with another gang, *147 the Young Mafia Fellaz ("YMF") to murder rival gang members.
On May 8, 2013, fifteen individuals were indicted in connection with the activities of the 110'ers. Among those indicted were the Defendants,[2] who were jointly charged with conspiracy to commit racketeering (Count 1); conspiracy to commit illegal use of weapons (Count 2); and the second degree murders of Shawanna Pierce and Brianna Allen (Counts 27 and 28).[3] With the exception of Count 1, all charges in the indictment were alleged, under La. R.S. 15:1403(B), to have been committed with the intent to promote, further, or assist in the affairs of a criminal gang. See La. R.S. 15:1403(B).
Before trial, Harden moved to sever the charges related to the murders of Ms. Pierce and Brianna (Counts 27 and 28) from all other charges and to exclude the hearsay statements of Sandifer and Newman. Each of the motions was denied.
On January 14, 2015, the State proceeded to trial against the Defendants on Counts 1, 2, 19, 21, 27, 28, 37, and 38. During the 11-day trial, the State presented the testimony of 49 witnesses and introduced 192 exhibits. At the conclusion of trial, the jury rendered the following verdicts:
• Count 1 (conspiracy to commit racketeering): as to Sandifer and Newman, guilty as charged; as to Harden, not guilty;
• Count 2 (conspiracy to commit illegal use of weapons): as to each of the Defendants, guilty as charged;
• Counts 27 and 28 (second degree murder): as to each of the Defendants, guilty as charged;[4] as to Sandifer *148 and Newman only the jury further found that these murders were committed "in furtherance of criminal gang activities."
On November 17, 2015, the Defendants were sentenced as follows:
• Count 1 (conspiracy to commit racketeering): Sandifer and Newman were each sentenced to 50 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence;
• Count 2 (conspiracy to commit illegal use of weapons): Sandifer, Newman, and Harden were each sentenced to 10 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence;
• Counts 27 and 28 (the second degree murders of Ms. Pierce and Brianna): Sandifer, Newman, Harden were each sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence; and, as to Sandifer and Newman, an additional 25 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in light of the jury's finding that the murders had been committed in furtherance of gang activity.[5]
This appeal followed.[6]
DISCUSSION[7]
Together, the Defendants assign 17 errors. The assignments overlap considerably, and each of the Defendants has adopted the assignments of the others. For ease of discussion, we organize the assignments into the five issues-(1) cognizability; (2) sufficiency; (3) severance; (4) admissibility; and (5) sentencing-and address the assignment by issue rather than number.
Cognizability[8]
The Defendants contend that conspiracy to commit racketeering and illegal use of *149 weapons during a crime of violence are non-cognizable double inchoate crimes. The Defendants also contend that, because those crimes are non-cognizable, the jury instructions were erroneous, confusing, and resulted in a "vague verdict."[9] The State contends that neither issue has been preserved for appellate review.
As to the jury instructions, the State's argument has merit. The Defendants failed to object to the jury instructions on any basis; thus, they failed to preserve for appellate review any issue relating to the jury instructions.[10] See La. C.Cr.P. art. 841(A) (providing that "[a]n irregularity or error cannot be availed of *150 after verdict unless it was objected to at the time of occurrence"); see also State v. Lincoln, 17-0170, pp. 37-38 (La. App. 4 Cir. 11/3/17), 231 So.3d 161, 182 (observing that "[t]his Court has also found that the failure to object to jury instructions precludes a defendant from raising the issue on appeal" and collecting cases).
As to cognizability, however, we note that "[t]he conviction of a non-crime is an error patent which can be recognized by [an] appellate court on its own." State v. Marsh , 17-0584, p. 4, n. 5 (La. App. 4 Cir. 11/8/17), 231 So.3d 736, 739 ; see also State v. Mayeux , 498 So.2d 701, 702-04 (La. 1986) (recognizing, as an error patent, that attempted aggravated battery is not a crime in Louisiana). Accordingly, we will address the Defendants' argument as to the cognizability of conspiracy to commit racketeering.[11]
The Louisiana Racketeering Act, La. R.S. 15:1351, et seq. (the "LRA"), provides, in pertinent part, as follows:
A. It is unlawful for any person who has knowingly received any proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in immovable property or in the establishment or operation of any enterprise.
B. It is unlawful for any person, through a pattern of racketeering activity, knowingly to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or immovable property.
C. It is unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.
D. It is unlawful for any person to conspire or attempt to violate any of the provisions of Subsections A, B, or C of this Section.
La. R.S. 15:1353. Under La. R.S. 15:1353(D), a conspiracy to violate Sections (A), (B), or (C) is a cognizable, statutorily defined crime. Accord State v. Richards , 426 So.2d 1314, 1316 (La. 1982) (observing that "[a] criminal conspiracy to commit a crime is an inchoate crime separate and distinct from the completed criminal act") (citing State v. Brown , 398 So.2d 1381 (La. 1981) ).
Nonetheless, the Defendants argue that, because the definition of racketeering activity set forth in La. R.S. 15:1352(A) includes inchoate crimes, conspiracy to violate La. R.S. 15:1353(C) is a double-inchoate crime and is, thus, non-cognizable. This court recently rejected that argument in State v. Davenport , 16-0223, p. 30 (La. App. 4 Cir. 10/18/17), --- So.3d ----, ----, 2017 WL 4700652, *16 noting that "conspiracy to commit racketeering under La. R.S. 15:1353(D) is a valid crime, even though an underlying inchoate crime may be a part of the racketeering activity on which the crime is based." The related assignments of error are without merit.
Sufficiency
The Defendants contend that the State failed to offer sufficient evidence to support their convictions for the second degree murders of Ms. Pierce and Brianna, conspiracy to commit illegal use of weapons, *151 and conspiracy to commit racketeering.[12] In State v. Brown , 12-0626, pp. 6-8 (La. App. 4 Cir. 4/10/13), 115 So.3d 564, 570-71, we set forth the standard of review for claims of insufficiency as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Green , 588 So.2d 757 (La. App. 4 Cir. 1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall , 523 So.2d 1305 (La. 1988). The reviewing court must consider the record as a whole. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Id. at 1310. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith , 600 So.2d 1319, 1324 (La. 1992).
When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro , 431 So.2d 372 (La. 1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from the Jackson reasonable doubt standard; rather, it is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright , 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs , 504 So.2d 817 (La. 1987).
Applying this standard, we discuss each of the convictions for which the Defendants contend there is insufficient evidence.
Second Degree Murder
On the morning of May 29, 2012, Stanton "Nan Nan" Guillory (a YMF member) took a silver Nissan Maxima from his girlfriend, Alexandria "Marissa" Perkins, and picked up Raheem Jackson and Harden (also YMF members) and Brian Marigny (a friend of Jackson). Guillory was armed with a two-tone, silver and black Smith & Wesson semi-automatic handgun that he had borrowed from Charles "Buddy" Lewis (a 110'er); Harden was armed with a Ruger handgun. While they were riding around the city, Guillory and Harden agreed on a plan to shoot at rival gang members. They called Sandifer and Newman, who agreed to join them. Jackson and Marigny were dropped off because they were unarmed. Sandifer and Newman were included because both were known to be armed; in particular, Newman was known to have access to an assault rifle.
The four-Guillory, Harden, Sandifer, and Newman-then drove to the intersection of Simon Bolivar Avenue and Martin *152 Luther King Boulevard, where they spotted a crowd, including rival gang members Lionel "Lonnie B" Allen, Burnell "Baldy" Allen, Emanuel "Duke" Casame, and Delwin "Pooh" McClauren. Guillory, who was driving, circled the block several times before parking the Maxima on a side street. Sandifer, Newman, and Harden exited the Maxima; Guillory remained in the vehicle. Sandifer and Newman were armed with handguns; Harden was armed with an assault rifle. Their exit from the Maxima was captured on surveillance video.
The three-Sandifer, Newman, and Harden-approached the crowd and opened fire. Sandifer and Newman focused their gunfire at several men standing on the median, striking two rival gang members; Harden fired over a dozen shots in the direction of a residence where a child's birthday party was being held, striking and killing Brianna, the daughter of Burnell Allen and the five-year-old niece of Lionel Allen. Ms. Pierce, who was driving her car nearby, was also struck in the head and killed by another one of Harden's bullets. When they had finished, the Defendants returned to the Nissan Maxima. Their reentry into the Maxima was also captured on surveillance video.[13]
To support a conviction for second degree murder, the State is required to prove that the defendant committed homicide with the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. In support of their contention that the evidence is insufficient to support their convictions for the second degree murders of Ms. Pierce and Brianna, the Defendants advance two arguments. First, they argue that, because the State offered only circumstantial evidence of identification, the State failed to carry its burden of negating any reasonable probability of misidentification. Second, they argue that the State did not prove beyond a reasonable doubt that they had the specific intent to kill or inflict great bodily harm. We address each argument in turn.
Identity
When, as in this case, a defendant's identity as the perpetrator is at issue-as opposed to whether the crime was committed-the State bears the burden of negating any reasonable probability of misidentification. State v. Hughes , 05-0992, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051 (citing State v. Weary , 03-3067 (La. 4/24/06), 931 So.2d 297 ; State v. Neal , 00-0674 (La. 6/29/01), 796 So.2d 649 ).
As an initial matter, we note that the State offered direct evidence of identity.[14] Casame, one of the rival gang members *153 shot at by the Defendants, identified Newman in open court as one of the three perpetrators. Eyewitness testimony that identifies a defendant as a perpetrator is direct evidence. State v. Laymon , 97-1520, p. 30 (La. App. 4 Cir. 3/15/00), 756 So.2d 1160, 1181. Such testimony was alone sufficient to negate any reasonable probability of misidentification as to Newman. See State v. Mussall , 523 So.2d 1305, 1311 (La. 1988) (observing that "eye witness testimony alone is usually sufficient in the mill run of cases").
Additionally, each of the Defendants confessed to various family members, friends, or acquaintances his involvement in the murders.[15] A confession is also direct evidence. State v. Allen , 41,548, p. 5 (La. App. 2 Cir. 11/15/06), 942 So.2d 1244, 1251 (observing that "[a] defendant's confession is direct evidence, for it is an acknowledgment of guilt for which no inference need be drawn") (citing La. R.S. 15:449 ; State v. McNeal , 34,593 (La. App. 2 Cir. 4/4/01), 785 So.2d 957 ; State v. Jones , 451 So.2d 35 (La. App. 2d Cir. 1984) ). Such testimony was alone sufficient to negate any reasonable probability of misidentification as to each of the Defendants. Allen , 41,548 at p. 5, 942 So.2d at 1251 (observing that "once proof independent of the confession confirms the fact of death by violent means, the confession alone can supply the proof linking the accused to the crime").
The State also offered overwhelming circumstantial evidence of identity, which alone was sufficient to negate any reasonable probability of misidentification.[16] The State offered evidence that the Defendants were members of cooperating gangs and that their targets were members of mutual rival gangs. The State offered evidence that, only hours before the murders, the Defendants were in possession of weapons consistent with those used to perpetrate the murders.[17] The State offered *154 evidence that placed the Defendants at the scene of the murders at the time they were committed.[18] Finally, the State offered evidence that, at the time of the murders, the Defendants' physical appearances were consistent both with eyewitness descriptions of and surveillance video depicting the perpetrators.[19] Together, this evidence was more than sufficient to negate any reasonable probability of misidentification as to each of the Defendants.
Specific Intent
The Defendants further contend that the State failed to offer sufficient evidence of their specific intent to kill or inflict great bodily harm on Ms. Pierce and Brianna. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1) ; State v. Butler , 322 So.2d 189, 192-93 (La. 1975) ; see also State v. Neal , 00-0674, p. 10 (La. 6/29/01), 796 So.2d 649, 657 (observing that "clearly an offender who uses a high powered assault rifle and shoots indiscriminately ... at a group of people specifically intends to kill the victims"); State v. Tyler , 342 So.2d 574, 582 (La. 1977) (observing that "there is authority in law for the proposition that shooting into a crowd indiscriminately with intent to kill someone is an assault with intent to kill each of them") (citing State v. Thomas , 127 La. 576, 53 So. 868 (1911) ; Ragar v. State , 180 Ark. 1131, 24 S.W.2d 334 (1930) ; Scott v. State , 49 Ark. 156, 4 S.W. 750 (1887) ; 40 C.J.S. Homicide § 82 (1955) ). As a matter of law, that intent may be transferred to an unintended victim, "when a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim." State v. Weathersby , 13-0258, pp. 11-12 (La. App. 4 Cir. 4/16/14), 140 So.3d 260, 268.[20]
*155 In this case, the evidence presented at trial established that, on May 29, 2012, the Defendants planned to murder whatever rival gang members they could find. Pursuant to the plan, they armed themselves and traveled to a location where they believed rival gang members would be present. On arrival, they observed a crowd, some of whom were rival gang members. Each of the Defendants fired at the crowd. This evidence was sufficient to permit a rational juror to infer that each of the Defendants shared the specific intent to kill or inflict great bodily harm on any and all persons present in the crowd, including Brianna. It was also sufficient, as a matter of law, to establish that such intent was transferred to Ms. Pierce (who was not present in the crowd).
Conspiracy to Commit Illegal Use of Weapons
Illegal use of weapons is "the intentional or criminally negligent discharging of any firearm ... where it is foreseeable that it may result in death or great bodily harm to a human being." La. R.S. 14:94(A). Conspiracy is "the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination." La. R.S. 14:26(A). Proof of a conspiracy may be by direct or circumstantial evidence. State v. Johnson , 438 So.2d 1091, 1099 (La. 1983). If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense. La. R.S. 14:26(B). The Defendants contend that the State failed to offer sufficient evidence to establish an agreement among the Defendants to commit the crime of illegal use of weapons. We disagree.
The evidence established that, on May 29, 2012, Guillory and Harden agreed on a plan to shoot at members of a rival gang later that day. Guillory and Harden (who were armed) then contacted Sandifer and Newman (whom they knew to be armed), invited them to participate, and picked them up. The four then drove to another part of town where they expected to find rival gang members. On arrival, while Guillory (the driver) stayed with the vehicle, the Defendants exited the vehicle and opened fired in an attempt to murder as many rival gang members as they could find. The Defendants then returned to the vehicle; and the four departed the scene together. This evidence was sufficient to establish an agreement among the Defendants to commit the crime of illegal use of weapons.
Conspiracy to Commit Racketeering[21]
The Defendants were convicted, under La. R.S. 15:1353(D), of conspiring to violate *156 the LRA-specifically, La. R.S. 15:1353(C), which makes it a crime to conduct or participate in an enterprise through a pattern of racketeering. The Defendants argue that the State failed to prove the existence of an enterprise; an agreement to violate La. R.S. 15:1353(C) ; and a pattern of racketeering activity. We address each argument separately.
Enterprise[22]
The LRA defines "enterprise" to mean "any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities." La. R.S. 15:1352(B). In this case, the State proceeded under the theory that the 110'ers-the "Enterprise"-was an association-in-fact. An association-in-fact enterprise "is not the pattern of racketeering activity; it is an entity separate and apart from the pattern of activity in which it engages." U.S. v. Turkette , 452 U.S. 576, 583, 101 S.Ct. 2524, 2529, 69 L.Ed.2d 246 (1981). Additionally, "an association-in-fact enterprise must have a structure." Boyle v. United States , 556 U.S. 938, 945, 129 S.Ct. 2237, 2244, 173 L.Ed.2d 1265 (2009). In support of their contention that the State failed to prove the existence of an enterprise, the Defendants advance two arguments.
They first argue that the State failed to prove that the Enterprise existed separately from the racketeering activities. The record does not support that argument; to the contrary, the record reflects that the State offered considerable evidence, both direct and circumstantial, that the Enterprise had an existence separate from the pattern of racketeering activities.
Numerous witnesses testified that all members of the Enterprise operated under the common name of the "110'ers" and affiliated with one of three sub-gangs.[23] They had tattoos and flashed hand signs signifying their membership in the gang.[24] They frequently congregated in a designated area to discuss the gang's activities.[25] They appeared together in several gang-themed music videos.[26] They made *157 social media posts pledging loyalty to the gang.[27] They used a shared, coded language when discussing the gang's activities.[28] They pooled and traded weapons and ammunition.[29] To honor members murdered by rival gangs, they organized events at which customized memorial t-shirts were worn bearing the gang's name.[30] Upon committing their first murder, members were elevated to the rank(s)-both a status and a sub-group-of "Team Murder."[31] These facts are direct evidence that the Enterprise was an established and durable association-in-fact with an existence separate from the crimes committed by its members.
Moreover, it is now well settled that the existence of an association-in-fact may be "inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity" because "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." Boyle v. United States , 556 U.S. 938, 947, 129 S.Ct. 2237, 2245, 173 L.Ed.2d 1265 (2009) (internal *158 quotation marks omitted).[32] Thus, in addition to the considerable direct evidence detailed above, the members' pattern of racketeering activities constituted circumstantial evidence from which the jury was entitled to infer the existence of an association-in-fact. Given the breadth and duration of the racketeering activities in this case, that inference was not unreasonable.
Nonetheless, the Defendants argue that the State failed to prove that the Enterprise had sufficient structure to be an association-in-fact because no evidence was presented that the Enterprise had "leadership or management." An identical argument was considered and rejected in Boyle :
The crux of petitioner's argument is that a RICO enterprise must have structural features in addition to those that we think can be fairly inferred from the language of the statute. Although petitioner concedes that an association-in-fact enterprise may be an "informal" group and that "not much" structure is needed, he contends that such an enterprise must have at least some additional structural attributes, such as a structural "hierarchy," "role differentiation," a "unique modus operandi ," a "chain of command," "professionalism and sophistication of organization," "diversity and complexity of crimes," "membership dues, rules and regulations," "uncharged or additional crimes aside from predicate acts," an "internal discipline mechanism," "regular meetings regarding enterprise affairs," an "enterprise 'name,' " and "induction or initiation ceremonies and rituals."
We see no basis in the language of RICO for the structural requirements that petitioner asks us to recognize. As we said in [ United States v. Turkette , 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ], an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.
*159 Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.
556 U.S. at 947-48, 129 S.Ct. at 2245-46 (internal quotations marks and citations omitted). Thus, the Supreme Court held, clarifying its prior decision in Turkette , that "[a]n association-in-fact enterprise must have at least three structural features: [1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. , 556 U.S. at 946, 129 S.Ct. at 2244.[33]
In this case, the State proved that the Enterprise had multiple purposes;[34] the State proved relationships among numerous Enterprise members, including Sandifer and Newman; and the State proved that the Enterprise had existed since at least 2008. This evidence was sufficient to prove that the Enterprise had sufficient structure to constitute an association-in-fact.
Agreement
The Defendants contend that the State failed to offer sufficient proof of an agreement to violate the LRA;[35] instead, *160 the Defendants contend, "[t]he only evidence was of a haphazard, impulsive group of young men who did not [take] the time to make agreements."
As with other conspiracies, proof of an agreement to violate the LRA may be by direct or circumstantial evidence. State v. Johnson , 438 So.2d 1091, 1099 (La. 1983) ; see also U.S. v. Morado , 454 F.2d 167, 174 (5th Cir. 1972) (observing that proof of an agreement to commit racketeering "may rest upon inferences drawn from relevant and competent circumstantial evidence ordinarily the acts and conduct of the alleged conspirators themselves"). When, as in this case, "the enterprise is defined as an association in fact, proof of that enterprise may [also] prove an unlawful agreement." U.S. v. Bennett , 44 F.3d 1364, 1372 (8th Cir. 1995) (citing U.S. v. Pungitore , 910 F.2d 1084, 1114 (3rd Cir.1990) ). Once the conspiracy itself is established, the State "need only show slight evidence that a particular person was a member of a conspiracy." Morado , 454 F.2d at 175(internal quotation marks omitted). To be liable for the acts of his co-conspirators, that person "need not know the identity, or even the number, of his confederates." U.S. v. Andolschek , 142 F.2d 503, 507 (2d Cir. 1944).
In this case, as discussed elsewhere in this opinion, there was considerable evidence that the Enterprise existed as an association-in-fact, that murder was one of its principal purposes, and that numerous Enterprise members had committed gang-related murders. From the additional evidence that Sandifer and Newman were long-standing members of the Enterprise, the jury's inference that both Sandifer and Newman agreed to participate in the Enterprise's years-long pattern of gang-related murders was not unreasonable. Indeed, that Sandifer and Newman themselves also committed such murders made the inference unmistakable. See U.S. v. Elliott , 571 F.2d 880, 903 (5th Cir. 1978) (observing that, "[w]here, as here, the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable").
Pattern of Racketeering Activity
The Defendants contend that the State failed to prove that they engaged in a pattern of racketeering activity. Because the Defendants were charged with conspiracy to commit racketeering, however, the State was not required to prove that any member of the conspiracy engaged-either individually or in the aggregate-in a pattern of racketeering. Instead, the State was required to prove, at most, that a member of the conspiracy committed an act in furtherance of the conspiracy.[36] See *161 La. R.S. 14:26(A) (providing that "an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination"). While the Defendants concede that "the State proved racketeering activities were performed by one or more of the alleged members of the 110'ers," as discussed elsewhere in this opinion, the State also proved that the Defendants themselves committed an act in furtherance of the 110'ers' conspiracy to violate the LRA-the murders of Ms. Pierce and Brianna.
Accordingly, we find that the State offered sufficient evidence to support the Defendants' convictions for conspiracy to commit racketeering, conspiracy to commit illegal use of weapons, and murder. The related assignments of error are without merit.
Severance[37]
The Defendants contend that some of the charges against them were improperly joined and that such joinder was prejudicial. The State argues that, even if joinder was improper, the Defendants were not prejudiced.
Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. La. C.Cr.P. art. 494. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count. Id. Similarly, two or more offenses may be charged in the same indictment if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. La. C.Cr.P. art. 493.
If it appears, however, that a defendant will be prejudiced, whether by joinder of defendants or offenses, a district court may order a severance or provide whatever other relief justice requires.[38] "A
*162 motion to sever is addressed to the sound discretion of the trial court, and the court's ruling should not be disturbed on appeal absent a showing of an abuse of discretion." State v. Brooks , 541 So.2d 801, 804 (La. 1989) (citing State v. Williams , 418 So.2d 562, 564 (La. 1982) ).
In determining on appeal whether a district court has abused its discretion, the relevant inquiry is not whether joinder was improper but whether joinder of charges was prejudicial.[39] That inquiry is guided by the following considerations:
(1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile.
State v. Deruise , 98-0541, p. 7 (La. 4/3/01), 802 So.2d 1224, 1232. It is well-settled that
there is no prejudicial effect from the joinder of two or more offenses when the evidence of each offense is relatively simple and distinct, even though such evidence might not have been admissible in separate trials of the offenses because, with a proper charge, the jury can easily keep the evidence of each offense separate in its deliberations.
State v. Celestine , 452 So.2d 676, 680 (La. 1984). It is equally well-settled that the state can "curtail any prejudice with an orderly presentation of evidence." State v. Horton , 458 So.2d 445, 447 (La. 1984).
Moreover, prejudice is not the only relevant consideration. In ruling on a motion to sever, a reviewing court "must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources." Deruise , 98-0541 at p. 7, 802 So.2d at 1232.[40] The interest in judicial economy is particularly compelling in the context of racketeering prosecutions, which often involve numerous defendants, numerous charges, and extensive evidence. See, e.g. , United States v. Jones , 303 F.R.D. 279, 287 (E.D. La. 2014) (observing, in a 12-defendant, 20-count RICO Act case, that severance of the non-RICO defendants from the RICO defendants was not warranted, in part because any prejudice *163 "would be outweighed by the burden of trying this case more than once").
While the State's case was considerable in size and scope, comprising almost 50 witnesses and 200 exhibits, the State's presentation of its case was organized and orderly. The State began its case by presenting, through the testimony of numerous former 110'ers, extensive background information on the gang, its members, and its activities. The State then offered evidence, in essentially chronological order, of the numerous discrete acts of racketeering activity committed by the Defendants and other 110'ers, as well as the investigation of those crimes by the police. The State concluded its presentation by offering the testimony of various experts to corroborate and elucidate the testimony of the preceding lay witnesses.[41]
The jury's verdicts-all of which were unanimous-reflect the organized and orderly presentation of the State's case. Significantly, in addition to the verdicts of guilty of as charged, the jury acquitted Harden as to the conspiracy to commit racketeering (Count 1); the jury returned a lesser responsive verdict of first degree robbery as to Sandifer's charge of armed robbery with a firearm (Count 21) and additionally found that Sandifer had not committed that crime in furtherance of gang activity; the jury found that Harden had not committed the murders of Ms. Pierce and Brianna (Counts 27 and 28) in furtherance of gang activity; and the jury found that Newman had not committed the second degree murder of Marlon Smith (Count 37) or the attempted second degree murder of Kevon Robinson (Count 38) in furtherance of gang activity. These verdicts demonstrate that the jury was not confused, hostile, or wiling to infer a criminal disposition and that the jury was able to distinguish between the Defendants, the charges, and the evidence; the verdicts thus belie any argument that the Defendants were prejudiced by joinder of the charges in this case. Thus, the Defendants have not demonstrated that the district court abused its discretion in denying the motion to sever. The related assignments of error are without merit.
Admissibility
The Defendants contend that they were prejudiced by the admission at their joint trial of their mutually inculpatory confessions to the murders of Ms. Pierce and Brianna because the confessions constituted inadmissible hearsay as to the non-testifying co-defendants and, thus, violated their federal Sixth Amendment right *164 to confrontation under Bruton v. United States , 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The State counters that, under La. C.E. art. 801(D)(2)(a), the confessions were not hearsay and that, even if the statements were hearsay, they were nonetheless admissible under La. C.E. art. 804(B)(3) as statements against interest. The State further counters that the statements were "non-testimonial" under Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which the State argues abrogated Bruton , and that, thus, admission of the statements did not violate the Defendants' right to confrontation.
We need not resolve these issues. Even assuming the confessions contained inadmissible hearsay-which we do not decide-the erroneous admission of hearsay is a confrontation error subject to harmless error analysis. State v. Robinson , 01-0273, p. 9 (La. 5/17/02), 817 So.2d 1131, 1137 (observing that "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt") (quoting Delaware v. Van Arsdall , 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) ). Factors to be considered by a reviewing court include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id.
Additionally, when, as here, the complained-of hearsay is the mutually inculpatory confession of a non-testifying co-defendant, the Supreme Court of the United States has observed that a reviewing court may consider the extent to which the confession "interlocks" with a confession by the defendant. See Cruz v. New York , 481 U.S. 186, 194, 107 S.Ct. 1714, 1719, 95 L.Ed. 2d 162 (1987) (observing that the interlocking statement of a non-testifying co-defendant "may be considered on appeal in assessing whether any Confrontation Clause violation was harmless"). Consistent with Van Arsdall and Cruz , courts have found the erroneous admission of a co-defendant's mutually inculpatory confession to be harmless where such confession interlocked with the defendant's own confession and the other evidence against the defendant was overwhelming.[42] Such is the case here.
Each of the Defendants made interlocking confessions that were introduced at trial. As discussed elsewhere in this opinion, the other evidence of the Defendants' guilt was overwhelming. At trial, witnesses testified that the Defendants devised a plan to shoot at rival gang members; cellphone location data placed the Defendants *165 at the scene of the murders (rival gang territory); Casame (a rival gang member) identified Newman in open court as one of the perpetrators who shot at him; several more witnesses testified that, in video from the area of the murders, they recognized the Defendants, as well as the Maxima the perpetrators arrived and fled in; and ballistic evidence recovered from the scene was linked to a handgun in the Defendants' possession at the time of the murders. In light of this overwhelming evidence, any error in the admission of the Defendants' statements was harmless. The related assignments of error are without merit.
Sentencing
The Defendants contend that several of their sentences are excessive, are illegal, or constitute double jeopardy. We address each sentence individually.
Count 1
(Conspiracy to Commit Racketeering)
Sandifer and Newman contend that their 50-year sentences for conspiracy to commit racketeering are illegal because these were imposed without benefit of parole, probation, or suspension of sentence. Under the LRA, the prohibition of benefits is authorized only when the amount of the violation exceeds $10,000-which was neither alleged nor proven in this case. La. R.S. 15:1354(A). Thus, the sentences are illegal. The related assignments of error have merit.
Sandifer and Newman also contend that their sentences for conspiracy to commit racketeering and the gang enhancements for the murders of Ms. Pierce and Brianna constitute double jeopardy.[43] The United States and Louisiana constitutions both protect against double jeopardy. U.S. Const. Amend. V, (providing that "[n]o person shall be ... subject for the same offence to be twice put in jeopardy of life or limb"); La. Const. Art. I, § 15 (providing that "[n]o person shall be twice placed in jeopardy for the same offense"). These protections "not only prohibit successive trials for the same offense but also 'protect[ ] against multiple punishments for the same offense.' " State v. Murray , 00-1258, p. 3 (La. 9/18/01), 799 So.2d 453, 454-55, as amended on reh'g (Oct. 26, 2001) (quoting North Carolina v. Pearce , 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) ).
In Murray , the Louisiana Supreme Court set out the framework for analyzing claimed double jeopardy violations as follows:
When the same act or transaction constitutes a violation of two distinct statutory provisions, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States , 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) (selling narcotics not in original stamped package and selling narcotics not in pursuance to a written order of the purchaser constituted two different offenses although arising from a single delivery of narcotics); see Texas v. Cobb , 532 U.S. 162, 173, 121 S.Ct. 1335, 1343, 149 L.Ed.2d 321 (2001) ("We have since applied the Blockburger test to delineate the scope of the Fifth Amendment's *166 Double Jeopardy Clause, which prevents multiple or successive prosecutions for the 'same offense.' ") (citing Brown v. Ohio , 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (barring successive prosecutions of greater and lesser included offenses) ). Louisiana's somewhat broader "same evidence" test considers not only the material elements of each offense but also whether the evidence required to convict of one crime would also support conviction of the other, focusing "on the evidence necessary for conviction, not all the evidence introduced at trial." State v. Steele , 387 So.2d 1175, 1177 (La. 1980).
00-1258 at pp. 3-4, 799 So.2d at 455.
Although the gang-related murders of Ms. Pierce and Brianna constituted an act in furtherance of the conspiracy to commit racketeering, the conspiracy required proof of an additional element not required by the gang enhancement-an agreement to violate the LRA. Thus, the sentences for conspiracy to commit racketeering and the gang-enhanced sentences for the murders of Ms. Pierce and Brianna do not violate double jeopardy. Accord State v. Davenport , 16-0223, p. 34 (La. App. 4 Cir. 10/18/17), --- So.3d ----, ----, (observing that "[t]he elements to prove conspiracy to commit racketeering differ from the elements required under the gang enhancement statute"). The related assignments of error are without merit.
Count 2
(Conspiracy to Commit Illegal Use of Weapons)
The Defendants contend that their 10-year sentences without benefit of parole, probation, or suspension of sentence for conspiracy to commit illegal use of weapons are illegal because they exceed the statutory maximum. The Defendants were convicted of conspiracy to commit illegal use of weapons under La. R.S. 14:94(A).[44] The maximum sentence for that offense is imprisonment with or without hard labor for not more than one year.[45] Thus, the Defendants' sentences are illegal.
Although the Defendants neither objected to nor filed motions to reconsider their sentences on this basis, and thus failed to preserve this issue for our review, we notice the issue as an error patent. La. C.Cr.P. art. 882(A) (providing that "[a]n illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review"). Because correction of the Defendants' illegal sentences implicates the sentencing discretion of the district court, we vacate the sentence and remand for resentencing under La. R.S. 14:94(B) and La. R.S. 14:26(D). See *167 State v. Haynes , 04-1893 (La. 12/10/04), 889 So.2d 224 (per curiam ) (holding that "[t]o the extent that the amendment of [a] defendant's sentence entails more than a ministerial correction of a sentencing error, the decision in State v. Williams , 00-1725 (La. 11/28/01), 800 So.2d 790, does not sanction the sua sponte correction made by the court of appeal on defendant's appeal of his conviction and sentence").
Count 19
(Illegal Carrying of Weapons)
Sandifer and Newman argue that their 10-year sentences for illegal carrying of weapons are illegal because they were neither convicted nor charged with that crime. They are correct. The related assignments of error have merit.
Counts 27, 28
(Second Degree Murder of Ms. Pierce and Brianna)
Sandifer and Newman, who were juveniles at the time of the murders, contend that their life sentences are excessive because the district court failed to conduct the hearing required by Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).[46] The State contends that the district court did conduct a Miller hearing but that Sandifer and Newman simply failed to present any evidence in mitigation. Sandifer and Newman contend that, even if the district court did conduct a Miller hearing, their counsels' failure to present evidence in mitigation at that hearing was ineffective assistance of counsel. The State contends that neither Sandifer nor Newman can establish that his counsel was ineffective because, in the more than three years since Sandifer and Newman were convicted, neither has produced any mitigating evidence, despite having opportunities to do so.
We need not resolve these issues. A common thread running through the Supreme Court's sentencing jurisprudence is the recognition that a juvenile's potential for rehabilitation requires special consideration. See Miller , 567 U.S. at 471, 132 S.Ct. at 2464 (reasoning that "[b]ecause juveniles have diminished culpability and greater prospects for reform ... they are less deserving of the most severe punishments") (internal quotation marks, alterations, and citation omitted).[47] In sentencing *168 Sandifer and Newman, however, the district court refused to consider their potential for rehabilitation[48] -or any evidence *169 thereof.[49] The district court's refusal was legal error requiring vacatur and remand. See State v. Lee , 11-0398, p. 6 (La. App. 4 Cir. 1/30/12), 83 So.3d 1191, 1196 (observing that "[a] district court by definition abuses its discretion when it makes an error of law") (quoting Koon v. United States , 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (internal quotation marks omitted) ); accord State v. Pearson , 836 N.W.2d 88, 97 (Iowa 2013) (vacating a sentence where the district court failed to consider the potential for rehabilitation, as required by Miller ).[50] The related assignments of error have merit.[51]
Sandifer and Newman also contend that, as to the related gang enhancements, although the November 17, 2015 minute entry incorrectly reflects that the district court imposed the enhancements without benefit of parole, probation, or suspension of sentence, the sentencing transcript reflects that the trial judge imposed no such restrictions. Sandifer and Newman are correct. When there is a discrepancy between a minute entry and a transcript, the transcript prevails. State v. Bridges , 11-1666 (La. App. 4 Cir. 11/28/12), 104 So.3d 657, 659. The related assignments of error have merit.
DECREE
For the foregoing reasons, the Defendants' convictions are affirmed. The Defendants' sentences are affirmed, except as follows: Sandifer's and Newman's sentences for illegal carrying of weapons are vacated. As to Count 1, Sandifer's and Newman's sentences for conspiracy to commit racketeering are corrected to remove the prohibition on parole, probation, *170 and suspension of sentence. As to Count 2, the Defendants' sentences are vacated. As to Counts 27, 28, and 37, Sandifer's and Newman's life sentences are vacated; the gang enhancements are corrected to remove the prohibition on parole, probation, and suspension of sentence. The case is remanded for resentencing.
On remand, the district court is instructed to correct the record to remove reference to Sandifer's and Newman's sentences for illegal carrying of weapons; as to Count 1, to correct the record to remove the prohibition on parole, probation, and suspension of sentence; as to Count 2, to resentence the Defendants; and as to Counts 27, 28, and 37, to conduct Miller hearings as to Sandifer and Newman, to resentence Sandifer and Newman, and to correct the record to remove the prohibition on parole, probation, and suspension of sentence as to the gang enhancements.
CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART, CORRECTED IN PART, VACATED IN PART, AND REMANDED

The name "110'ers" is an amalgamation of "11" and "10"-the wards that embrace the Lower Garden District.

In addition to the Defendants, the other individuals indicted were Rico "Max" or "Lil Rico" Newman; Antonio "Big Rico" Johnson; Eric "E," "E-Slim," or "E-Gunna" Shelbia; Ja'on "Sticks" Jones; Joshua "Josh" Pittman; Kerry "Jordan" Pittman; Ronald "Remo" Thompson; Stanton "Nan Nan" or "Na Na" Guillory; Charles "Buddy" Lewis; Kevin "Calhoun" Calhoun; Charlie "Mac" Brown; and Joseph "Doo-Man" Bienemy.

Sandifer was additionally charged with the August 14, 2011 second degree murder of Milton Davis (Count 20); the October 3, 2011 armed robbery with a firearm of Albert Monaco (Count 21); being an accessory after the fact to the June 14, 2012 second degree murder of Marlon Smith (Count 39); being an accessory after the fact to the June 14, 2012 attempted second degree murder of Kevon Robinson (Count 40); and possession with the intent to distribute cocaine (Count 42). Sandifer's charge related to the murder of Milton Davis (Count 20) was severed and proceeded to a separate trial on August 18, 2014; at the conclusion of that trial, Sandifer was found guilty as charged. State v. Sandifer , 15-0590 (La. App. 4 Cir. 4/20/16), 195 So.3d 119. Newman was additionally charged with the February 20, 2011 attempted second degree murder of Leo "Nitty" Riles (Count 18); the June 11, 2012 second degree murder of Jonathan "Kruga" Lewis (Count 35) and attempted second degree murder of Michael Coleman (Count 36); and the June 14, 2012 second degree murder of Marlon Smith (Count 37) and attempted second degree murder of Kevon Robinson (Count 38). Newman's charge related to the murder of Jonathan "Kruga" Lewis (Count 35) was severed and proceeded to a separate trial on October 7, 2014; at the conclusion of that trial, Newman was found guilty as charged. The record does not reflect whether Newman's trial also disposed of the June 11, 2012 attempted second degree murder of Michael Coleman (Count 36). Harden was additionally charged with an August 10, 2011 illegal carrying of weapons (Count 19); that crime was also alleged, under La. R.S. 14:95(E), to have been committed during the perpetration of a crime of violence-aggravated flight (a violation of La. R.S. 14:108.1(C) ).

As to Count 19, the jury found Harden guilty as charged of illegal carry of weapons (Count 19) and further found that such illegal carrying had been committed during a crime of violence. As to Count 21 (armed robbery with a firearm), the jury found Sandifer guilty of first degree robbery (La. R.S. 14:64.1, a statutorily enumerated lesser included offense, see La. C.Cr.P. art. 814(22) ). As to Count 37 (second degree murder), the jury found Newman guilty as charged. As to Count 38 (attempted second degree murder), the jury found Newman guilty as charged.

For illegal carrying of weapons (Count 19), Harden was sentenced to 10 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. For first degree robbery (Count 21), Sandifer was sentenced to 40 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. For second degree murder (Count 37), the district court sentenced Newman to life imprisonment without benefit of parole, probation, or suspension of sentence. For attempted murder (Count 38), the district court sentenced Newman to 50 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

On December 16, 2015, while this appeal was pending, Newman filed a motion to reconsider sentence in the district court. This court remanded the case to the district court for the purpose of allowing it to rule on Newman's motion. The district court denied the motion.

Pursuant to La. C.Cr.P. art. 920, we have reviewed the record for errors patent. Although we find several, the Defendants have briefed all such errors in their assignments. Accordingly, we consider those errors in our discussion.

When the sufficiency of the evidence is assigned as error, we ordinarily discuss that assignment of error first. See State v. Hearold , 603 So.2d 731, 734 (La. 1992) (observing that "[w]hen issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence ... [because] the accused may be entitled to an acquittal under Hudson v. Louisiana , 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981)"). We address cognizability first, however, because no amount of evidence is sufficient to support a conviction for a non-cognizable crime. See State v. Marsh , 17-0584 (La. App. 4 Cir. 11/8/17), 231 So.3d 736 (addressing cognizability before sufficiency).

The Defendants also contend that the jury instructions were erroneous and confusing because the indictment charged the Defendants with racketeering-not with conspiracy to commit racketeering. Review of the record, however, reveals that Count 1 of the indictment charged the Defendants with "unlawfully and knowingly conspir[ing] and engag[ing] in the commission of the crime of Racketeering under [La. R.S.] 15:1353 [C] ...." Moreover, the record reflects that defense counsel for each of the Defendants had actual notice that Count 1 charged the Defendants with conspiracy to commit racketeering. Each of the Defendants filed a motion for a bill of particulars requesting to know upon which statutes they were being prosecuted; to each of the Defendants the State furnished a bill of particulars indicating that, as to Count 1, they were charged, under La. R.S. 15:1353(D), with conspiracy to commit racketeering.

The Defendants contend, citing State v. Williamson , 389 So.2d 1328 (La. 1980), that we should nonetheless review the complained-of jury instructions as error patent because "[t]he Louisiana Supreme Court has determined that an instruction that misdefines the crime likewise cannot be found harmless and needs no contemporaneous objection to preserve the error for appellate review." We disagree for two reasons.
First, this case is distinguishable from Williamson . In that case, because of an erroneous instruction, the defendant was convicted of a non-responsive lesser included offense; in this case, the Defendants were found guilty as charged of conspiracy to commit racketeering and conspiracy to commit illegal use of weapons. While it is true that, as to the conspiracy to commit illegal use of weapons, the district court instructed the jury that a non-cognizable double-inchoate crime-attempted conspiracy to commit illegal use of weapons-was a responsive lesser included offense, the Defendants were not convicted of that offense and therefore have no basis to complain of the error-patent or otherwise. See La. C.Cr.P. art. 921 (providing that "[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused").
Second, this case does not fit within the limited exception created by Williamson . As cases decided by the Louisiana Supreme Court since Williamson have made clear, its application is sharply limited to cases in which the complained-of error is structural-that is, "of such significance as to violate fundamental requirements of due process." See State v. Hongo , 96-2060, p. 5, n. 3 (La. 12/02/97), 706 So.2d 419, 422 ; see also id. (noting that State v. Thomas , 427 So.2d 428, 435 (La. 1982), limited Williamson by stating that it "should not be construed as authorizing appellate review of every alleged constitutional violation and erroneous jury instruction urged first on appeal without timely objection"); State v. Howard , 98-0064, p. 18 (La. 4/23/99), 751 So.2d 783, 804 (observing that "this Court has also on two occasions explicitly cautioned that Williamson did not establish jurisprudentially the equivalent of a 'plain error' rule created by F.R.Crim.P. 52(b)") (citing State v. Arvie , 505 So.2d 44, 48 (La. 1987) ; Thomas , supra ). While it is true that the district court added as an element of illegal use of weapons "that one or more of the parties to the agreement committed, solicited, coerced or intim[id]ated another to commit a crime of violence," that addition was not a structural error and thus is not error patent. See Hongo , 96-2060 at pp. 4-5, 706 So.2d at 421-22 (observing that "add[ing] [an] improper additional element ... is not of such magnitude as to vitiate all jury findings and may well have ... no effect whatsoever" and that, thus, "a defendant must make a contemporaneous objection in order to preserve the error for direct review").

As discussed elsewhere in this opinion, because the Defendants were not convicted of conspiracy to commit illegal use of weapons during a crime of violence, the assignments of error regarding the cognizability of that charge are moot.

Although the Defendants were each convicted of additional crimes, they challenge the sufficiency of the evidence only as to these convictions.

No surveillance video captured the actual shooting.

The Louisiana Supreme Court has discussed the distinction between direct and circumstantial evidence as follows:
The characterization of evidence as "direct" or "circumstantial" points to the kind of inference which is sought to be drawn from the evidence to the truth of the proposition for which it is offered. If the inference sought is merely that certain facts are true because a witness reported his observation and the assumption that witnesses are worthy of belief, the evidence is direct. When, however, the evidence is offered also for some further proposition based upon some inference other than merely the inference from assertion to the truth of the fact asserted, then the evidence is circumstantial evidence of this further fact-to-be-inferred.
State v. Graham , 422 So.2d 123, 129-30 (La. 1982) ; see also State v. Johnson , 438 So.2d 1091, 1103 (La. 1983) (observing that, "[g]enerally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; whereas, circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience").

While the Defendants assign as error the admission of these statements at their joint trial, the parsing of admissible versus inadmissible evidence is not permitted when considering the sufficiency of the evidence. McDaniel v. Brown , 558 U.S. 120, 131, 130 S.Ct. 665, 672, 175 L.Ed.2d 582 (2010) (per curiam ) (observing that " '[a] reviewing court must consider all of the evidence admitted by the trial court,' regardless of whether that evidence was admitted erroneously.") (quoting Lockhart v. Nelson , 488 U.S. 33, 41, 109 S.Ct. 285, 291, 102 L.Ed.2d 265 (1988) ); accord State v. Hearold , 603 So.2d 731, 734 (La. 1992) (observing that "when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal"); see also generally 6 Wayne R. LaFave, Criminal Procedure § 25.4(c), at 652 (3d ed. 2007) (observing that an appellate court, in conducting a Jackson analysis, is "assessing the legal sufficiency of the evidence not at the trial that will be, but at the trial that was.") (citation omitted).

See State v. Buteaux , 2017-877, pp. 13-15 (La. App. 3 Cir. 3/14/18), 241 So.3d 1094, 1099-1100 (finding circumstantial evidence of identity sufficient); State v. Stock , 16-552, pp. 9-10 (La. App. 5 Cir. 2/22/17), 212 So.3d 1268, 1276 (same); State v. Scott , 15-0778, pp. 10-11 (La. App. 4 Cir. 6/29/16), 197 So.3d 298, 305, writ denied , 16-1542 (La. 6/5/17), 219 So.3d 339 (same); State v. Harris , 15-485, pp. 10-12 (La. App. 5 Cir. 4/13/16), 190 So.3d 466, 474-75, writ denied , 16-0902 (La. 5/12/17), 220 So.3d 746 (same); State v. Davis , 05-733, pp. 9-10 (La. App. 5 Cir. 2/27/06), 924 So.2d 1096, 1102-03 (same); State v. Crotwell , 00-2551, pp. 5-7 (La. App. 1 Cir. 11/9/01), 818 So.2d 34, 39-40 (same); State v. Forrest , 95-31, pp. 17-18 (La. App. 5 Cir. 2/14/96), 670 So.2d 1263, 1271-72 (same).

Specifically, the State offered the testimony of Jackson and Marigny that Guillory and Harden were in possession of handguns before they picked up Sandifer and Newman. Additionally, the State introduced evidence that shell casings discovered at the scene were from bullets fired by a handgun-the two-tone, silver and black Smith & Wesson-loaned to Guillory by Charles "Buddy" Lewis shortly before the murders.

Jackson, Marigny, Marissa Perkins, and Ja'on Jones (Sandifer's girlfriend) each testified that, shortly after the murders, they reviewed video captured by surveillance cameras near the scene and later broadcast by the news media. From that video, Jackson, Marigny, Perkins, and Jones all identified Harden as one of three individuals depicted exiting and reentering the Maxima; Jackson and Jones further identified Sandifer and Newman as the other two individuals exiting and reentering the Maxima. Similarly, Perkins testified that the Maxima depicted in the video was the vehicle Guillory had taken from her on the morning of the murders; Jackson and Marigny testified that the Maxima was the vehicle in which they had ridden with Guillory and Harden earlier that day; and Jones testified that the Maxima was the vehicle in which Guillory and Harden had collected Sandifer and Newman. Each witness was certain of his or her identifications.
Additionally, cellphone location data obtained from the Defendants' respective service providers corroborated the testimony of numerous witnesses regarding the Defendants' movements both before and after the murders. The data also reflected that the Defendants' cellphones were in the vicinity of the murders at the time the murders were committed. The data also reflected that, although the Defendants' cellphones were in constant use immediately before and after the murders, none of their cellphones was in use during the murders.

In particular, Casame testified that the perpetrator wielding the assault rifle wore his hair in dreads; Jackson, Marigny, Perkins, and Jones each testified that, at the time of the murders, Harden wore his hair in dreads. Similarly, Casame testified that the perpetrator who shot him in the face with a handgun had a mohawk; Jones testified that, at the time of the murders, Newman had a mohawk. The jury was also presented with numerous photographs and video of the Defendants depicting their appearances before the murders.

While the specific intent of one principal generally cannot be transferred to another, see State v. Bridgewater , 00-1529, pp. 10-11 (La. 1/15/02), 823 So.2d 877, 890, evidence that a defendant has planned, prepared for, and actively participated in the perpetration of the overall crime, albeit not the actus reus itself, is sufficient to establish shared intent to impose liability as a principal. See, e.g. , State v. Quac Tran , 08-1103 (La. App. 4 Cir. 8/13/09), 18 So.3d 165 (finding that evidence that one of the defendants, who had not been present for the entirety of the perpetration of a robbery, but who had engaged in an act of intimidation, was sufficient to support that defendant's conviction for attempted simple robbery).

The LRA is similar in structure to the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. (the "RICO Act"); and Louisiana courts have regarded federal jurisprudence interpreting the RICO Act as persuasive. See State v. Nine Sav. Accounts , 553 So.2d 823, 825 (La. 1989) ("observing that, "[b]ecause [the LRA] was apparently patterned after [the RICO Act], federal decisions in this area are persuasive"). Accordingly, to the extent no Louisiana court has addressed the LRA issues presented in this appeal, we are guided by federal jurisprudence interpreting the RICO Act and note, where appropriate, any difference between the two.

Although, as discussed elsewhere in this opinion, the State offered sufficient evidence to prove the existence of an enterprise, we note that there is tension in the jurisprudence as to whether the State was required to do so. Compare City of New York v. Bello , 579 F. App'x 15, 17 (2d Cir. 2014) (observing that "the existence of a RICO enterprise is not a required element of a RICO conspiracy claim"); with U.S. v. Pinson , 860 F.3d 152, 161 (4th Cir. 2017) (observing that "to prove a RICO conspiracy, evidence must show the existence of a RICO 'enterprise' in which the defendant conspired to participate").

See U.S. v. Ramirez-Rivera , 800 F.3d 1, 19 (1st Cir. 2015) (noting, in finding the government had produced "more than sufficient evidence" of the existence of an enterprise, that the defendants were part of a "super-gang" composed of constituent sub-gangs).

See U.S. v. Rios , 830 F.3d 403, 421 (6th Cir. 2016) (finding evidence that alleged gang members bore tattoos evidencing gang affiliation "highly relevant because the case involved a RICO conspiracy charge, so the government was required to prove both the existence of a racketeering enterprise and each defendant's association with that enterprise").

See U.S. v. Applins , 637 F.3d 59, 77 (2d Cir. 2011) (noting, in discussing whether the government had offered sufficient evidence of the existence of an association-in-fact, that "gang members congregated daily in their territory").

See Carrillo v. Gonzalez , No. 09-CV-6400CJC RNB, 2010 WL 1642535, at *8 (C.D. Cal. Feb. 22, 2010), report and recommendation adopted , No. 09-CV-6400-CJC RNB, 2010 WL 1641124 (C.D. Cal. Apr. 20, 2010) (finding that "[a] music video of a song entitled 'Gangsta Games,' in which [gang] members ... are depicted flashing the gang's hand signs and simulating various crimes" was relevant, and therefore admissible, "for the limited purpose of proving that the Colonia Chiques is a criminal street gang").

See U.S. v. Dailey , No. 17-CR-20740, 2017 WL 5664185, at *1 (E.D. Mich. Nov. 27, 2017) (noting, in revoking the bond of a defendant indicted under 18 U.S.C. § 1962(d) for participating in a criminal street gang, that members of the alleged enterprise "regularly use[d] social media websites such as Instagram, Twitter, Facebook and YouTube to highlight their affiliation with the gang, as well as to boast about their criminal activities").

See U.S. v. Miller , 116 F.3d 641, 652 (2d Cir. 1997) (observing, in discussing the evidence of the existence of the enterprise, that members "communicated in coded language and numerical systems"); see also U.S. v. Adams , 759 F.2d 1099, 1115 (3d Cir. 1985) (noting that participants in a racketeering conspiracy "took care to speak in coded language").

See United States v. Nascimento , 491 F.3d 25, 33 (1st Cir. 2007) (observing, in discussing the existence of the enterprise, that "members used a shared cache of firearms that were regarded as property of the gang"); United States v. Diaz , 176 F.3d 52, 103 (2d Cir. 1999) (noting that evidence that members of a street gang "maintained and shared weapons for use in their criminal activities" was relevant to proving the existence of an association-in-fact enterprise).

See Sisneros v. Neushmid , No. 17-CV-01499-JKS, 2018 WL 2010431, at *22 (E.D. Cal. Apr. 30, 2018) (observing, in considering whether the State had established that a federal habeas petitioner participated in criminal gang activity, that a "criminal street gang's activities include[d] 'all getting together for functions' such as 'funerals' " and that attendance at gang-member funerals was a means of demonstrating "loyalty not only to their particular set but also an association with the larger ... street gang as a whole") (alterations omitted); Kuhr ex rel. Kuhr v. Millard Pub. Sch. Dist. , No. 09-CV-363, 2011 WL 5402658, at *1 (D. Neb. Nov. 8, 2011) (considering the affidavit of a member of a gang intelligence unit attesting that "gang members often wore t-shirts in honor of other members who had been 'killed in the line of duty' "; that "[s]uch shirts bore the words 'RIP' and the gang member's name, along with a picture and the dates of birth and death"; that in "covertly observing many gang funerals from 1997 to 2007 [he] saw such t-shirts at these funerals"; and "such shirts have been worn almost exclusively by gang members or related gang associations") (internal quotation marks omitted).

See U.S. v. Lawson , No. 10-CR-329, 2013 WL 257312, at *1 (E.D. La. Jan. 23, 2013) (discussing a similar gang structure and noting that "the Murder Squad [was] the enforcement faction of the Harvey Hustlers").

Before Boyle , there was tension in the jurisprudence regarding what proof was sufficient to establish the existence of an association-in-fact. See Johnson v. Cain , 347 F. App'x 89, 92, n. 3 (5th Cir. 2009) (unpub. ) (a pre-Boyle case noting that the "division among Louisiana's courts of appeals mirrors a similar split among the federal circuits applying RICO" (citing Odom v. Microsoft Corp. , 486 F.3d 541, 550-51 (9th Cir. 2007) (detailing the disagreement among federal courts on the issue) ). Boyle resolved that tension by holding that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." 556 U.S. at 951, 129 S.Ct. at 2237 ; see also State v. Davenport , 16-0223 at p. 21, --- So.3d at ----, 2017 WL 4700652 at * 11 (observing that, after Boyle , "the phrase 'beyond that inherent in the pattern of racketeering activity' is correctly interpreted to mean that the enterprises [sic] existence is a separate element that must be proved, not that such existence may never be inferred from the evidence showing that the associates engaged in a pattern of racketeering activity").

Since Boyle , courts have found that criminal street gangs like the Enterprise had sufficient structure to constitute an association-in-fact. See U.S. v. Gills , 702 F. App'x 367, 374 (6th Cir. 2017) (unpub. ) (observing that, "under th[e] [Boyle ] test, other circuits have held that street gangs can be enterprises") (citing U.S. v. McGill , 815 F.3d 846, 930-31 (D.C. Cir. 2016) ; U.S. v. Ramirez-Rivera , 800 F.3d 1, 19 (1st Cir. 2015) ; U.S. v. Kamahele , 748 F.3d 984, 1003-05 (10th Cir. 2014) ); see also, e.g. , U.S. v. McArthur , 850 F.3d 925 (8th Cir. 2017).

Numerous former 110'ers testified at trial to these purposes. Eric "E-Slim" Shelbia testified that the Enterprise's purposes included "[m]oney, females, and murder"; Corey "C-Slim" Jackson testified that the Enterprise's purposes included "[d]rugs, money, extortion, [and] murder"; Oscar James testified that the Enterprise's purposes included "[g]et[ting] loaded, robbing, and killing"; Keith "Head" Battle testified that the Enterprise's purposes included "[m]oney and murder"; and Kerry "Jordan" Pittman testified that the Enterprise's purposes included "[s]elling drugs, kill[ing], [and] rob[bing]."
Nonetheless, the Defendants contend that the State failed to prove that there was any "sharing of the fruits of any crime," that the Enterprise had a "profit-making or profit-sharing plan" or, indeed, "made any money" at all. The State, however, was not required to prove that the Enterprise existed for an economic purpose. See Nat'l Org. for Women, Inc. v. Scheidler , 510 U.S. 249, 262, 114 S.Ct. 798, 806, 127 L.Ed.2d 99 (1994) (holding that "RICO contains no economic motive requirement"); see also U.S. v. Kamahele , 748 F.3d 984, 1004 (10th Cir. 2014) (noting that "enhancing the gang's reputation by instilling fear through criminal activity" was a valid enterprise purpose under the RICO Act); U.S. v. Olson , 450 F.3d 655, 665 (7th Cir. 2006) (noting that one of the purposes of the Latin Kings (a street gang) was "to preserve and protect the power of the enterprise, its associates and members through intimidation, threats of violence and acts of violence, including murder"); U.S. v. Smith , 413 F.3d 1253, 1264, 1268 (10th Cir. 2005) (concluding that the purpose element could consist of maintenance of the group's fearsome reputation through acts of violence).

In their briefs, the Defendants conflate the concepts of conspiracy to commit a crime constituting a discrete incident of racketeering activity with an overarching conspiracy to violate the LRA by engaging in a pattern of racketeering activity. These concepts are, however, distinct. Criminal liability under La. R.S. 15:1353(D) is imposed not because an individual has agreed to commit a single incident of racketeering activity but because he has agreed with others to violate the LRA. See U.S. v. Corrado , 227 F.3d 528, 541-42 (6th Cir. 2000) (holding that "a RICO conspiracy ... is considered a single object conspiracy with that object being the violation of RICO.... [T]hus, the underlying acts of racketeering in a RICO conspiracy are not considered to be the objects of the conspiracy, but simply conduct that is relevant to the central objective-participating in a criminal enterprise") (internal citations omitted); see also State v. Touchet , 99-1416, pp. 9-10 (La. App. 3 Cir. 4/5/00), 759 So.2d 194, 201 (holding that, although "the State's evidence showed that Mr. Touchet and Mr. Walton did 'join minds' to accomplish a concerted, unlawful purpose," the State had not proven an agreement to violate the LRA because "that purpose had nothing to do with setting up or conducting a separate, ongoing racket or enterprise").

It is questionable whether the State was required to prove even this. In Salinas v. U.S. , 522 U.S. 52, 63, 118 S.Ct. 469, 476, 139 L.Ed.2d 352 (1997), the United States Supreme Court held that "[t]here is no requirement of some overt act or specific act in [the RICO Act] unlike the general conspiracy provision applicable to federal crimes, which requires that at least one of the conspirators have committed an 'act to effect the object of the conspiracy.' " Since Salinas , it is well-settled that proof of a pattern of racketeering is not required to establish a conspiracy to violate the RICO Act. See U.S. v. Applins , 637 F.3d 59, 74 (2d Cir. 2011) (observing that, in Salinas , "the Court rejected defendant Salinas's argument that the government must prove that he had committed two predicate acts"); see also United States v. Yannotti , 541 F.3d 112, 121-22 (2d Cir. 2008) (discussing Salinas ). To date, no Louisiana court has distinguished the holding of Salinas under the LRA; to the contrary, this court has cited the holding in Salinas with approval, albeit in dictum . See Davenport , 16-0223 at p. 23, --- So.3d at ---- (observing that "under § 1962(d), it is sufficient that the defendants 'adopt the goal of furthering or facilitating the criminal endeavor' to prove conspiracy to violate RICO") (citing Salinas , 522 U.S. at 65, 118 S.Ct. 469 ); but cf. State v. Touchet , 99-1416, pp. 9-10 (La. App. 3 Cir. 4/5/00), 759 So.2d 194, 200-01 (assuming without discussion that the definition of conspiracy under La. R.S. 15:1353(D) is supplied by La. R.S. 14:26 but concluding that the State had failed to prove conspiracy to violate the LRA because the defendants did not "join minds" for that purpose).

The State contends that, as to Sandifer and Newman, the issue of severance has not been preserved for appellate review because neither moved to sever. Because Harden moved to sever, however, this issue has been preserved. See La. C.Cr.P. art. 842 (providing that, "[i]f an objection has been made when more than one defendant is on trial, it shall be presumed, unless the contrary appears, that the objection has been made by all the defendants"); see also State v. Lavigne , 412 So.2d 993, 995 (La. 1982) (observing that State v. Bergeron , 371 So.2d 1309 (La. 1979), "extended the application of article 842 to written motions made by a co-defendant," including a motion to sever).

La. C.Cr.P art. 495.1 (providing that "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires").

The Louisiana Supreme Court has observed that "[t]he distinction between misjoinder and prejudicial joinder is an important one, but only at the trial level to determine whether a defendant's proper remedy is a motion to quash or a motion to sever"; whereas, "[a]t the appellate level, the distinction becomes blurred since the basis for the prohibition against both misjoinder and prejudicial joinder is, essentially, prejudice to the defendant." State v. Strickland , 94-0025, p. 13 (La. 11/1/96), 683 So.2d 218, 226 (citing State v. Mallett , 357 So.2d 1105, 1109 (La. 1978), cert. denied , 439 U.S. 1074, 99 S.Ct. 848, 59 L.Ed.2d 41 (1979) ). Accordingly, we consider the Defendants' misjoinder arguments only to the extent they bear on our analysis of whether such joinder was prejudicial.

See also U.S. v. Posada-Rios , 158 F.3d 832, 863 (5th Cir. 1998) (observing, in the context of a RICO Act prosecution, that "[t]he possibility of prejudice [resulting from joinder] must also be balanced against the interest of judicial economy"); U.S. v. Eufrasio , 935 F.2d 553, 569 (3d Cir. 1991) (finding, in the context of a RICO Act prosecution, that "[t]he substantial public interest in the judicial economy of a joint trial outweigh[ed] the potential for prejudice to [two co-defendants] associated with evidence of [a third co-defendant's] murder conspiracy").

Nonetheless, the Defendants contend they were prejudiced by the presence of "spillover evidence." In this case, Count 1 of the indictment charged a conspiracy to commit racketeering. With the exception of two counts-2 and 19-all other counts in the indictment fit within the definition of racketeering activity and were alleged to be part of a pattern of racketeering activity; thus, as to those racketeering-related counts, there was no spillover evidence. As to Count 2, the evidence presented to establish the murders of Ms. Pierce and Brianna was also probative of the conspiracy to commit illegal use of weapons; thus, as to Count 2, there was no spillover evidence. As to Count 19, the evidence of that charge-the testimony of two officers who pursued Harden as he fled, one of whom observed Harden in possession of a firearm, and a recorded conversation in which Harden discusses the flight-was both simple and sufficient; thus, there is no basis to conclude that the jury's verdict as to that charge was the result of any spillover evidence from the other charges. See U.S. v. Barton , 647 F.2d 224, 241 (2d Cir. 1981) (concluding that the likelihood of jury confusion was "quite remote" in a case where one jointly indicted co-defendant "was not alleged to have had any role in the appellants' [RICO] activities," "the actions attributed to her at trial were not complex," and "[t]he evidence against her was relatively simple and easy for the jury to consider without any spillover effect from the proof adduced against other defendants").

See, e.g. , State v. Jackson , 04-1388, pp. 11-12 (La. App. 5 Cir. 5/31/05), 904 So.2d 907, 914 ; State v. Taylor , 04-1389, pp. 9-10 (La. App. 5 Cir. 5/31/05), 905 So.2d 451, 457 ; State v. Hoffpauir , 99-1927, p. 4 (La. App. 3 Cir. 10/11/00), 772 So.2d 181, 183 ; State v. Harris , 98-2113 (La. App. 1 Cir. 6/25/99), 739 So.2d 312, 317-18 ; see also Denny v. Gudmanson , 252 F.3d 896, 904 (7th Cir. 2001) ; U.S. v. Wilson , 160 F.3d 732, 741 (D.C. Cir. 1998) ; Mata v. Ricketts , 981 F.2d 397, 401 (9th Cir. 1991) ; United States v. Petit , 841 F.2d 1546, 1557 (11th Cir. 1988). Indeed, at least one court has concluded that the additional evidence of guilt need not even been "overwhelming." See Fisher v. Mann , 122 F.3d 1056 (2d Cir. 1997) (observing that the Second Circuit has "expressly noted that in reviewing the effect of a Cruz violation, we need not find that, absent the co-defendant's confession, the evidence against the defendant is 'overwhelming,' provided it is 'weighty.' " (citing Glenn v. Bartlett , 98 F.3d 721, 729 (2d Cir.1996) ).

The State contends that the Defendants failed to preserve this issue for appellate review because "[t]here is no indication that any of the three defendants made a similar argument before the trial court." This court, however, reviews double jeopardy claims as error patent. See State v. Thomas , 99-2219, pp. 4-5 (La. App. 4 Cir. 5/17/00), 764 So.2d 1104, 1108 (holding that "this court will review the double jeopardy issue as an error patent"). Accordingly, we will address the merits of the related assignments of error.

The State contends that the Defendants were convicted of conspiracy to commit illegal use of weapons "during a crime of violence," the penalty for which is imprisonment at hard labor for more than ten years, without benefit of parole, probation, or suspension of sentence. See La. R.S. 14:94(F) ; La. R.S. 14:26(D). The State's contention, however, is belied by both the jury instructions and the verdict forms-neither of which contains such language.

See La. R.S. 14:94(B) (providing that "[w]hoever commits the crime of illegal use of weapons or dangerous instrumentalities shall be fined not more than one thousand dollars, or imprisoned with or without hard labor for not more than two years, or both"); La. R.S. 14:26(D) (providing that "[w]hoever is a party to a criminal conspiracy to commit [a crime for which the penalty is neither death nor life imprisonment] shall be fined or imprisoned, or both, in the same manner as for the offense contemplated by the conspirators; but such fine or imprisonment shall not exceed one-half of the largest fine, or one-half the longest term of imprisonment prescribed for such offense, or both").

Harden was an adult at the time he committed these murders and thus was subject to a mandatory sentence of life imprisonment without the benefit of parole.

The United States Supreme Court's decision in Miller was grounded in its previous juvenile sentencing decisions. See Graham v. Florida , 560 U.S. 48, 82, 130 S.Ct. 2011, 2034, 176 L.Ed.2d 825 (2010) (holding that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide"); Roper v. Simmons , 543 U.S. 551, 575, 125 S.Ct. 1183, 1198, 161 L.Ed.2d 1 (2005) (holding that "the death penalty cannot be imposed upon juvenile offenders"). Building on Roper and Graham , the Miller Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without [the] possibility of parole for juvenile offenders." 567 U.S. at 479, 132 S.Ct. at 2469. In so holding, the Supreme Court reasoned, in part, as follows:
Roper and Graham establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, "they are less deserving of the most severe punishments." Graham , 560 U.S. at 68, 130 S.Ct. at 2026. Those cases relied on three significant gaps between juveniles and adults. First, children have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking. Roper , 543 U.S. at 569, 125 S.Ct. 1183. Second, children "are more vulnerable ... to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. Ibid. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." Id. , at 570, 125 S.Ct. 1183.
Our decisions rested not only on common sense-on what "any parent knows"-but on science and social science as well. Id. , at 569, 125 S.Ct. 1183. In Roper , we cited studies showing that " '[o]nly a relatively small proportion of adolescents' " who engage in illegal activity " 'develop entrenched patterns of problem behavior.' " Id. , at 570, 125 S.Ct. 1183 (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003) ). And in Graham , we noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"-for example, in "parts of the brain involved in behavior control." 560 U.S. at 68, 130 S.Ct. at 2026.5 We reasoned that those findings-of transient rashness, proclivity for risk, and inability to assess consequences-both lessened a child's "moral culpability" and enhanced the prospect that, as the years go by and neurological development occurs, his " 'deficiencies will be reformed.' " Ibid. (quoting Roper , 543 U.S. at 570, 125 S.Ct. 1183 ).
Roper and Graham emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because " '[t]he heart of the retribution rationale' " relates to an offender's blameworthiness, " 'the case for retribution is not as strong with a minor as with an adult.' " Graham , 560 U.S. at 71, 130 S.Ct. at 2028 (quoting Tison v. Arizona , 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) ; Roper , 543 U.S. at 571, 125 S.Ct. 1183 ). Nor can deterrence do the work in this context, because " 'the same characteristics that render juveniles less culpable than adults' "-their immaturity, recklessness, and impetuosity-make them less likely to consider potential punishment. Graham , 560 U.S. at 72, 130 S.Ct. at 2028 (quoting Roper , 543 U.S. at 571, 125 S.Ct. 1183 ). Similarly, incapacitation could not support the life-without-parole sentence in Graham : Deciding that a "juvenile offender forever will be a danger to society" would require "mak[ing] a judgment that [he] is incorrigible"-but " 'incorrigibility is inconsistent with youth.' " 560 U.S. at 72-73, 130 S.Ct. at 2029 (quoting Workman v. Commonwealth , 429 S.W.2d 374, 378 (Ky. 1968) ). And for the same reason, rehabilitation could not justify that sentence. Life without parole "forswears altogether the rehabilitative ideal." Graham , 560 U.S. at 74, 130 S.Ct. at 2030. It reflects "an irrevocable judgment about [an offender's] value and place in society," at odds with a child's capacity for change. Ibid.
Id. , 567 U.S. at 471-73, 132 S.Ct. at 2464-65.
After Miller , the Legislature enacted La. C.Cr.P. art. 878.1, which governs the procedure to be followed by a district court when determining whether to sentence a juvenile to life imprisonment without the benefit of parole. The article provides, in relevant part, as follows:
C. At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender's level of family support, social history, and such other factors as the court may deem relevant. The admissibility of expert witness testimony in these matters shall be governed by Chapter 7 of the Code of Evidence.
D. The sole purpose of the hearing is to determine whether the sentence shall be imposed with or without parole eligibility. The court shall state for the record the considerations taken into account and the factual basis for its determination. Sentences imposed without parole eligibility and determinations that an offender is not entitled to parole eligibility should normally be reserved for the worst offenders and the worst cases.
La. C.Cr.P. art. 878.1(C)-(D).

In sentencing Sandifer and Harden to life imprisonment without the benefit of parole, the district court reasoned as follows:
So, counsel, with respect to Mr. Newman, who is the youngest of the three, just for correction of why Miller requires the opportunity to present mitigating factors in addition to the State being allowed to present aggravating factors. When we look at mitigating factors, we look at the past, the history, what potentially has occurred in a juvenile's life that might cause him or her to commit a murder, because that's when we consider Miller , we are not looking at what if in the future 20, or 30, or 40 years from now. If that were the case, we would apply that virtually in all sentences.
* * *
Can we predict what will happen with any of these three with Mr. Harden, Mr. Sandifer, or Mr. Newman when they are 30, 40, 50, 60 years old? No, we cannot. But that does not mean that they, themselves, as I said for Mr. Sandifer, cannot become better people while they live out their lives at the facility. So for purposes of Miller , the focus is not on the future but yet on the past.

Notwithstanding the repeated representations of trial counsel that they had retained an expert witness to call in mitigation and that the expert was unable to attend the sentencing hearing due to hospitalization, the district court denied trial counsel's requests to recess the hearing. The State contends that the district court correctly denied such requests because defense counsel neither identified the expert witness nor made any representation regarding the expected substance of the witness' testimony. Trial counsel, however, was neither requested nor given an opportunity to make such representations. The State also argues that Newman failed to offer any mitigation evidence in support of his motion to reconsider sentence. The district court, however, summarily denied the motion without affording defense counsel an opportunity to present evidence or argument.

Sandifer and Newman also contend that their life sentences without benefit of parole are excessive because they are coupled with a 25-year gang enhancement. Because we vacate Newman's life sentence, we decline to resolve that issue. We reserve Sandifer's and Newman's rights to raise this claim in a subsequent appeal from the sentence to be imposed by the district court on remand.

While Newman challenges only his life sentences for Counts 27 and 28, our conclusion applies with equal force to his sentence for Count 37.